THE STATE OF OHIO, APPELLEE, *v.* WARE, APPELLANT.

(No. C-870443 — Decided May 25, 1988.)

*Arthur M. Ney, Jr.,* prosecuting attorney, and *David L. Prem,* for appellee.

*John K. Issenmann,* for appellant.

BLACK, J.   In a trial to the court without a jury, defendant-appellant, Shelton Ware, was found guilty of two counts of felonious assault and not guilty by reason of insanity of three other counts of felonious assault and two counts of aggravated burglary. Ware contends in his first assignment of error that the trial court erred in finding him guilty of the two counts of felonious assault at the same time it found him legally insane with respect to the other five counts, because the evidence demonstrated that Ware's conduct constituted one continuous series of actions and failed to demonstrate that he was sane for one brief period and insane for the rest of his criminal activity. We find no merit in this assignment of error. The conviction and sentence are to be affirmed.

The trial court concluded that Ware could be sentenced on only one of the two felonious assaults of which he was found guilty, because they were

allied offenses of similar import,[1] and it imposed an immediate sentence of imprisonment of eight years (actual incarceration) to fifteen years. In the same entry, the court postponed or stayed until Ware's "release on parole" the hearing on hospitalization or institutionalization that is mandated by R.C. 2945.40(A). We find merit in the second assignment of error, in which appellant asserts error in failing to conduct the statutory hearing. We conclude that the stay order must be vacated.[2]

The record discloses that on the night of February 1, 1987, Ware was living in an upper-floor apartment with a younger man, Benjamin Jones, with whom he had a close (impliedly homosexual) relationship, and that early in the evening they were together watching a videotape entitled "Sade." When Jones left the apartment, apparently to join a party elsewhere, Ware stayed, replaying the videotape. Between 1:00 and 2:00 a.m. Ware thought he heard Jones calling to him for help from apartment number one in the building and became convinced that Jones was being held a hostage by the occupants of that apartment. The occupants included Marrilene Wakefield, her common-law husband Johnnie Gibbs, two daughters and one or more sons. One of the daughters was Shanta Wakefield, seventeen years of age, and one of the sons was Jonathan.

In responding to the cries for help that Ware thought he heard, he consciously decided against two possible courses of action (calling the police or knocking on the apartment door to demand Jones's release), because neither course had proved effective in the immediate past. The police did not respond to his telephone calls, and his conversations with the Wakefield-Gibbs family were nonproductive, in his mind. He took matters into his own hands.

Seizing a butcher knife from his kitchen, he climbed onto the roof of the apartment building and descended a fire escape to the second floor. He kicked in a window and entered the apartment that was occupied by Madeline Kelly, sixty-one years old. She was huddled on the floor near her bed. When Ware tripped over her, he began to stab her with the knife, not saying a word. She said, "Please don't kill me. I got a little great-grandson, and I would like to see him grow up." Ware realized that he had the wrong woman and the wrong apartment. He stopped the attack, and leaving Kelly bleeding profusely, he exited the apartment by the shattered window. He then broke into the Wakefield-Gibbs apartment, kicking in a window. The room he entered was Shanta's bedroom. She fled, leaving the building by a back door, and in the parking lot, she kept Ware at a distance by running to the far side of a parked car. Awakened, Johnnie Gibbs took a rifle that happened to be unloaded and ran outside, yelling at Ware. Ware turned and charged. Gibbs struck him with the rifle once, but slipped and fell to the ground when he attempted to hit him again. Ware attacked Gibbs with the

[1] The first count charged Ware with felonious assault on Madeline Kelly on February 1, 1987, using a deadly weapon, in violation of R.C. 2903.11(A)(2). The second count charged him with felonious assault on the same person on the same day, inflicting serious physical harm, in violation of R.C. 2903.11(A)(1). The evidence disclosed only one attack on Madeline Kelly on February 1, 1987; it was with a knife and caused serious physical harm requiring seven hours of surgery.

[2] By reason of the complexity and the novelty of the questions raised in this appeal, we have *sua sponte* removed it from the accelerated calendar.

knife, and despite Gibbs' defensive countermeasures with the rifle, he was stabbed three times. One of those thrusts resulted in Ware's cutting his own hand when it slid from the handle to the blade. Gibbs' son Jonathan hit Ware with a bat, and Ware fled from the scene. Ware tried to hide the knife in a hole in the ground (it was later found), and he ran to the emergency room at the Veterans Administration Hospital for treatment of his cut hand. He was duly arrested.

Ware was charged with five counts of felonious assault (two types of felonious assault against Madeline Kelly, two against Johnnie Gibbs, and one against Shanta Wakefield) and two counts of aggravated burglary.

Following Ware's plea of not guilty by reason of insanity, he was examined by two professionals, Dr. Arthur Helm, M.D., a psychiatrist who later testified for Ware, and Donald Ormiston, Ph.D., a psychologist who testified in rebuttal for the prosecution. Both professionals are associated with the Court Psychiatric Clinic and had been appointed by the court to examine Ware in connection with his insanity plea. While they both agreed that Ware had chronic paranoid schizophrenic disorder (a mental disease) and that he knew the wrongfulness of his act, they differed in their opinions about whether Ware had the ability to refrain from doing the acts. Dr. Helm opined that Ware was unable to refrain from the criminal conduct because he was "totally impaired due to the mental illness at the time," but this opinion was later modified on cross-examination when the doctor conceded that Ware could not have been totally impaired since he stopped his attack on Madeline Kelly when he realized she was the wrong woman. The trial court elicited Dr. Helm's opinion that Ware followed the logic of his delusions when he ceased the attack on Madeline Kelly and redirected his compulsively irrational aggression to the occupants of apartment number one.

Dr. Ormiston, on the other hand, was of the opinion that, despite Ware's twenty-year history of mental disturbance and disease, he had the ability to refrain from doing his several criminal acts on the night in question.

The trial court concluded that Ware was not legally insane when he attacked Madeline Kelly, that he was legally insane during his subsequent acts, and that he was guilty of the first two counts and not guilty by reason of insanity of the other five counts. Sentencing was deferred. At the subsequent hearing (on the seventh day after the court's findings), the court considered the question whether to hold the mental-illness hearing required by R.C. 2945.40 or to incarcerate Ware immediately. The court chose to incarcerate him at once and to stay the hearing. The judgment entry of June 16, 1987, contains the following language:

"(Hearing under R.C. 2945.40 stayed until defendant is to be released on parole, at which time he is to be brought to Hamilton County for hearing at that time on Counts 3 through 7.)" (Parentheses *sic*.)[3]

Appellant argues in his first assignment of error that the guilty

---

[3] At the conclusion of the sentencing hearing, the trial court said:

"There will be a stay and so forth on the hearing, but if in fact the stay is invalid, it is my intention that he do the time that I commit him to rather to be subjected to R.C. 2945.45 [*sic*]. In other words, it's my intent not to hold the hearing required and have him released from my jurisdiction rather than to not be able to sentence him on the crimes of which he was convicted."

finding for the assault of Madeline Kelly was erroneous because the evidence does not support the court's conclusion that Ware wavered between sanity and insanity during the course of events on February 1, 1987. He asks for a discharge from the conviction. We find no merit in his arguments, because as the trier of the facts, the court exercised its power to resolve the evidentiary conflict about Ware's ability to refrain from criminal activity, and the court's conclusions will not be overturned solely by reason of facial inconsistency. *State* v. *DeHass* (1967), 10 Ohio St. 2d 230, 39 O.O. 2d 366, 227 N.E. 2d 212.

The results of this trial are remarkably similar to those reported in *State* v. *Brown* (1984), 12 Ohio St. 3d 147, 12 OBR 186, 465 N.E. 2d 889, in which a jury found the accused not guilty by reason of insanity of two rapes but guilty of a third rape, gross sexual imposition, a kidnapping, and a robbery, all of which arose out of a continuum of events in the course of one night. Finding expert testimony in the record that the accused could fade " 'in and out of sanity,' " the Supreme Court affirmed the convictions.[4] In the instant case, the court's split findings are supported by Dr. Helm's testimony, taken as a whole. The conviction of and sentence for the felonious assault of Madeline Kelly are affirmed.

The second assignment of error attacks the trial court's attempted stay of the hospitalization hearing after the finding of not guilty by reason of insanity.[5] Whether the stay order was valid depends on an interpretation of R.C. 2945.40. The statute does not expressly address the situation under consideration when a defendant is simultaneously found guilty of one or more offenses and not guilty by reason of insanity of the other offenses. In that situation, must the defendant serve the sentence before or after his commitment to a mental institution for treatment? We look to the language of the statute and the context in which it was adopted. As we said in *State* v. *Cravens* (1988), 42 Ohio App. 3d 69, 72, 536 N.E. 2d 686, 689:

"The interpretation of a statute is the determination of what the statute means. The interpretation starts and ends with the words chosen by the legislature, but it is not limited to the words alone, because the whole context of the enactment must be considered.

"The process of interpretation requires (1) a decision about the purpose to be attributed to the statute and (2) a decision about the meaning of the legislature's words that will carry out that purpose. The words have a double function: they serve as guides to

---

[4] The instant case is clearly distinguishable on the facts from *State* v. *Brown* (1983), 5 Ohio St. 3d 133, 5 OBR 266, 449 N.E. 2d 449, in which the Supreme Court affirmed a court of appeals decision that reversed a conviction as against the manifest weight of the evidence, because in that case all the witnesses, expert and lay, opined that the defendant was insane and there was no testimony contra. We do not believe *Brown, supra,* stands for the principle that the trier of facts is bound by the testimony of any one expert, especially when there is conflicting expert testimony.

[5] The prosecutor's primary response to appellant's second assignment of error is that the stay order was not a final appealable order. This argument is without merit. The stay order was incorporated as a part of the judgment entry that imposed an immediate sentence of eight to fifteen years. That entry was indisputably final and appealable under R.C. 2505.02, and this court clearly has jurisdiction of the appeal. The appellant is entitled to raise whatever claim of error he may perceive in the record, including the attempted deferment of the hearing mandated under R.C. 2945.40.

discovery of the purpose, and they serve as limitations on the extent of the statute's applications. The words must be taken in their usual, normal or customary meaning."

The language of R.C. 2945.40 and its relationship with other statutes relating to the mental illness of accused or convicted persons (the context of the statute, in this instance) combine to lead us to a single conclusion.

The words chosen by the legislature are unequivocal and leave no room for doubt. R.C. 2945.40(A) provides that the court shall conduct a hearing to determine whether a person found not guilty by reason of insanity is "a mentally ill person subject to hospitalization by court order or a mentally retarded person subject to institutionalization by court order," as defined in R.C. 5122.01 and 5123.01. There are provisions for the temporary detention of the defendant until the hearing. The third paragraph of R.C. 2945.40(A) reads:

"*The hearing shall be held in the trial court within seven court days* after the finding of not guilty by reason of insanity. *Failure to conduct the hearing within the seven-day period shall cause the immediate discharge of the respondent,* unless a continuance is granted by the judge for not longer than seven court days for good cause shown." (Emphasis added.)

There are no provisions for a stay of the hearing. The hearing obviously must be held within seven "court days" of the finding of not guilty by reason of insanity (or fourteen court days, for good cause shown), or the "respondent" shall be discharged. The language bears a clear implication that if the respondent is concurrently sentenced to imprisonment for crimes other than his "insane" ones, the treatment shall come first.

Turning to other statutes that address the handling of accused persons and convicted persons who have mental illnesses (the context of R.C. 2945.40), we find that the legislature has clearly adopted the humane principle that no person shall be either tried or punished while he is insane. R.C. 2945.37 *et seq.* provide that the trial of an accused found incompetent to assist in his own defense shall not be held or continued so long as he is incompetent. R.C. 5120.17 requires that a mentally ill or mentally retarded prisoner serving a sentence shall be committed to the Department of Mental Health or the Department of Mental Retardation and Developmental Disabilities for treatment, until discharged therefrom. R.C. 2949.28 *et seq.* require that the death sentence of an insane convict shall be suspended until he is restored to sanity. See *In re Keaton* (1969), 19 Ohio App. 2d 254, 48 O.O. 2d 376, 250 N.E. 2d 901, vacated as to the death penalty (1972), 408 U.S. 936. R.C. 2967.22 provides for the temporary detention and determination of status of parolees, furloughees and probationers if the parole or probation officer has reason to believe the individual is mentally ill or retarded. These statutes set forth with clarity the legislative purpose of treating mentally ill and retarded convicts before or in lieu of punishment.

We note that the young man in *State* v. *Brown, supra,* 12 Ohio St. 3d at 149, 12 OBR at 187, 465 N.E. 2d at 891, who was convicted of four counts and found not guilty by reason of insanity of two other counts was later found to be mentally ill subject to hospitalization and was ordered confined to the mental hospital *before* beginning his prison sentence. This sequence was not questioned on appeal, and the case is not authority binding on us for the instant decision, but it demonstrates that our conclusions are identical to those of another court.

The appellant's convictions and sentence are affirmed. This case is

remanded to the trial court with instructions to enter an order that shall vacate that portion of its final judgment entry journalized June 16, 1987, that stays the hearing under R.C. 2945.40, and an order that shall discharge Ware under the third, fourth, fifth, sixth and seventh counts of the indictment.

*Judgment accordingly.*

SHANNON, P.J., and KLUSMEIER, J., concur.