# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2008-CT-01445-SCT

*KEIR D. SANDERS*

*v.*

*STATE OF MISSISSIPPI*

### ON WRIT OF CERTIORARI

| | |
|---|---|
| DATE OF JUDGMENT: | 05/30/2008 |
| TRIAL JUDGE: | HON. THOMAS J. GARDNER, III |
| COURT FROM WHICH APPEALED: | TISHOMINGO COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | OFFICE OF INDIGENT APPEALS |
| | BY: HUNTER NOLAN AIKENS |
| | LESLIE S. LEE |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: JEFFREY A. KLINGFUSS |
| DISTRICT ATTORNEY: | JOHN RICHARD YOUNG |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 04/07/2011 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**PIERCE, JUSTICE, FOR THE COURT:**

¶1.     More than twenty years after the murder of W.D. and Elma Crawford, their grandson Keir Sanders was arrested and indicted for their murders. He was tried by the Circuit Court of Tishomingo County, sitting, on a change of venue, in Lee County. Sanders was found not guilty of murder by reason of insanity on Count I, but the jury found that he remained insane

and a danger to the community. On Count II, Sanders was found guilty of murder, and he was sentenced to life in prison as a habitual offender. The circuit court ordered him confined to the Mississippi State Hospital at Whitfield on Count I, and sentenced him to life in prison on Count II, with the confinement pursuant to Count I to be suspended until such time as Sanders is released on Count II. Sanders appealed his conviction and sentence, presenting four issues on appeal:

I.      The Verdict Is Against the Overwhelming Weight of the Evidence, and it Was Error for the Circuit Court to Deny Sanders's Motion for a New Trial.

II.     The Circuit Court Erred in Giving the State's Jury Instruction on Flight When the Defense Presented an Independent Reason for Sanders's Flight.

III.    The Circuit Court Erred by Admitting Gruesome Autopsy Photographs of the Victims into Evidence.

IV.     The Circuit Court Erred by Requiring Sanders to Serve the Life Sentence Pursuant to Count II Before Being Conveyed to the State Mental Hospital Pursuant to Count I.

The Court of Appeals affirmed as to all issues. We granted Sanders's petition for certiorari as to issues I, II, and IV. Finding no merit in the issues Sanders raises on certiorari review, we affirm his conviction and sentence as well as the judgment of the Court of Appeals.

**FACTS AND PROCEDURAL HISTORY**[1]

¶2.     On the morning of December 29, 1985, W.D. and Elma Crawford were attacked in their Tishomingo County home. While W.D. was cooking breakfast, someone shot him in

---

[1]The facts and procedural history have been appropriated from the thorough opinion prepared by the Court of Appeals, styled *Sanders v. State*, ___So. 3d ___, 2010 WL 780456 (Miss. Ct. App., March 9, 2010).

2

the back with a shotgun and then killed him by bludgeoning him in the back of the head with a hammer. After killing W.D., the attacker proceeded to the bedroom and shot Elma with a shotgun while she was lying in bed. The attacker fled the scene in the couple's car.

¶3. Later that night, Officer Mike Kemp, chief deputy with the Tishomingo County Sheriff's Department in 1985, responded to a call concerning W.D. and Elma. Jannie Hadley, daughter of the couple, had called Tennessee authorities to say that she could not reach her parents. This was reported to Officer Kemp, who went to investigate with auxiliary deputy David Johnson.

¶4. Upon arriving, Officer Kemp discovered that the door was ajar, and he heard a voice coming from inside. Inside the house, he discovered Elma lying on the couch, covered in blood. According to Officer Kemp, Elma told him that her grandson, Sanders, had shot her and W.D. She did not know where Sanders was. Officer Kemp discovered that the phone had been pulled from the wall, so he returned to his squad car to call for backup.

¶5. Authorities searched the scene and discovered that Elma had been shot in the bedroom. After Sanders had shot her, she had crawled down a small flight of steps and had written "K D shotgun" on the floor using her own blood. W.D. was found face down on the floor of the kitchen. The hammer that Sanders had used to beat him was found in a trash can in the house. Neither the shotgun nor the couple's car was found at the scene.

¶6. Elma was taken to the hospital, where she spent several weeks in the intensive care unit. According to Sandra Puckett, who was the ICU supervisor and staff nurse at Iuka Hospital in 1985, Elma suffered a shotgun blast to her breast and right upper abdomen. Puckett said that Elma was afraid that she would never go home and that Sanders would

3

finish her off. During Elma's stay in the hospital, she lost considerable amounts of blood, and she suffered multiple infections. She died on March 4, 1986. Sanders was twenty-one years old at the time of the shootings.

¶7. Authorities eventually located W.D.'s car parked in a motel parking lot in Memphis, Tennessee, on January 6, 1986. However, no more was heard from Sanders until 2005. In December 2005, Officer Guillermo Cantu, Jr., with the San Antonio Police Department, apprehended Sanders in San Antonio, Texas, after observing his suspicious behavior. Officer Guillermo found that Sanders was carrying his birth certificate, and he arrested Sanders after discovering the outstanding warrants for murder in Mississippi. Mickey Baker, with the Mississippi Bureau of Investigation division of the Mississippi State Highway Patrol, traveled to San Antonio with a fingerprint card for Sanders. He discovered that Sanders had used six different aliases since 1990.

¶8. Sanders was transported back to Mississippi, and he was indicted by a grand jury in Tishomingo County for Count I, the murder of W.D., and Count II, the murder of Elma. Venue was changed from Tishomingo to Lafayette County. The trial resulted in a mistrial, and venue was changed to Lee County. In Sanders's defense during the trial in Lee County, he presented the testimony of his mother, Jannie, and stepfather, Gerald Hadley. He also called two experts to testify – Dr. John McCoy and Dr. Mark Webb.

¶9. Jannie testified concerning Sanders's childhood. She said that Sanders was diagnosed with schizophrenia at the age of eight or nine, and he changed when he was a teenager. Noticeable changes included Sanders quitting school, refusing to look in mirrors, screaming, hearing things, and sitting by himself for hours. Sanders was sent away for treatment at the

4

Redemption Ranch in Pikeville, Tennessee; however, he ran away and was expelled. Jannie said that Sanders would spin around in his room and beat his head against the wall. When he came home, he was worse; he could not use utensils, he covered mirrors, and he stayed all alone. In 1982, after a confrontation, Sanders was sent away to Mid-South Hospital in Memphis. He later went to a halfway house, but he was asked to leave. Next, in 1984, Sanders was sent to the Mississippi State Hospital at Whitfield. However, he stayed for only a few weeks before he ran away from Whitfield and moved back in with his grandparents.

¶10. Sanders was treated at Mid-South from November 19, 1982, until he was discharged in August 1983. Dr. McCoy was a clinical psychologist at Mid-South during this time, and he treated Sanders. He described Sanders as follows: "He was really, very sick. He was the most mentally ill of all the patients in the hospital. He came in reporting bizarre symptoms. He was the sickest one that had been in that hospital in a long time." Dr. McCoy also described some of Sanders's symptoms: changing the pitch of his voice, burning Bibles, waking up cursing and fighting, talking to himself, covering or breaking mirrors, refusing to use toiletry articles except for toothpaste, sleeping on the top of the covers with his shoes on, slamming doors, jumping off the roof and out of windows at the behest of "voices," and attacking people. He also said Sanders was paranoid, disoriented as to the date and time, and had delusions of persecution.

¶11. Dr. McCoy diagnosed Sanders as suffering from a schizoaffective disorder. He described the disorder as a combination of schizophrenia and bipolar disorder. He said that such a person generally is socially incompetent, has no friends, and has delusions and auditory hallucinations. It was Dr. McCoy's opinion that Sanders never should have been

5

discharged from Mid-South. Dr. McCoy also interviewed Sanders on May 10, 2008. It was Dr. McCoy's opinion that, at the time Sanders killed his grandparents, he was "laboring under a defect of reason from a disease of the mind." Dr. McCoy believed that Sanders understood the nature and quality of his actions, but that Sanders did not know that what he did was wrong.

¶12. Dr. Webb, a physician specializing in psychiatry with the Mississippi Neuropsychiatric Clinic in Jackson, evaluated Sanders on December 11, 2007, at the behest of the circuit court. Dr. Webb admitted that Sanders's situation was a close call; nevertheless, he agreed that, while Sanders understood the nature and quality of his actions, he did not know that his actions were wrong. Dr. Webb noted Sanders's possible history of aggressive and manipulative behavior, but he characterized Sanders as more paranoid than aggressive.

¶13. Dr. William Lott, a clinical psychologist, conducted a court-ordered forensic evaluation of Sanders on March 24, 2007. Dr. Lott noted the extended periods of time that Sanders was able to function successfully in society while not on any medications, and he also noted that Sanders had been off any medication for at least four years at the time of the examination. Dr. Lott testified that Sanders looked fine and that he did not appear to be psychotic. He also said that Sanders exhibited normal to above-average intelligence. In reviewing Sanders's history, Dr. Lott noted evidence of manipulative behavior and possible extensive drug use. Dr. Lott described Sanders as having a history of impulsive, aggressive behavior. He believed Sanders was spoiled as a result of being indulged. Dr. Lott also noted that the reports of Dr. Mona Carlyle, who had treated Sanders at and around the time he went to Mid-South and Whitfield, may have indicated that Sanders showed no signs of psychosis.

6

However, Dr. Carlyle's final report on Sanders from October 15, 1984, diagnosed atypical psychosis.

¶14.　Dr. Lott concluded that Sanders did understand the nature and quality of his actions. He noted that both Dr. McCoy and Dr. Webb initially had disagreed with this assessment. However, at trial, they had amended their opinions to agree with Dr. Lott. Contrary to the other doctors' assessments, Dr. Lott found that Sanders understood that what he did was wrong. According to Dr. Lott, Sanders's behavior during the murders was not random or psychotic; it was well-reasoned and well-intended. Supporting his conclusion was the fact that Sanders had unplugged the phone, wrapped the cord around it, and hid it under the sofa. Also, Sanders took his grandparents' car and immediately fled to Memphis, hiding the car in a busy parking lot. Sanders then made the trip to Texas and successfully avoided capture by adopting six different aliases over the next twenty years. Dr. Lott was suspicious that illegal drug use had played a part in Sanders's actions, even though there was little or no evidence that Sanders had used illegal drugs. Sanders did not testify in his own defense.

¶15.　While deliberating, the jury sent out a note with questions for the circuit court. It read as follows:

> What is the minimum sentence for someone that is found to be insane and a danger to the public?

> If the defendant is found "not guilty" by reason of insanity BUT is a danger to the public . . . [w]ill the defendant be allowed to ever walk as a free man on the street?

The circuit court did not answer the questions. The jury returned a verdict of not guilty on Count I, the murder of W.D., by reason of insanity, and found that Sanders had not been

7

restored to his sanity and was dangerous to the community. On Count II, the murder of Elma, the jury found Sanders guilty. The circuit court sentenced Sanders to life in prison as a habitual offender on Count II. On Count I, the court ordered Sanders to be confined to the state psychiatric hospital until such time as he is restored to his sanity, with Sanders's confinement to be delayed until he had served his life sentence on Count II. Sanders timely filed a motion for a judgment notwithstanding the verdict or, in the alternative, for a new trial, which the circuit court denied. His appeal was heard by the Court of Appeals, which affirmed the judgment of the Tishomingo Circuit Court. The motion for rehearing was denied. Sanders then filed his petition for certiorari, upon which we consider his appeal.

## DISCUSSION

¶16. Sanders petitioned this Court for certiorari review of only three issues:

   I.    Whether the verdict was against the overwhelming weight of the evidence, and whether the circuit court erred when it denied Sanders's Motion for a New Trial.

   II.   Whether the circuit court erred in giving the State's jury instruction on flight.

   III.  Whether the circuit court erred by requiring Sanders to serve the life sentence pursuant to Count II before being conveyed to the state mental hospital pursuant to Count I.

¶17. We discuss these in turn.

   **I.    Whether the verdict was against the overwhelming weight of the evidence, and whether the circuit court erred when it denied Sanders's Motion for a New Trial.**

¶18. Sanders contends that his conviction on Count II, the murder of his grandmother, was against the overwhelming weight of the evidence. When this Court is asked to review the

8

denial of a motion for a new trial based on the weight of the evidence, we review the evidence in the light most favorable to the verdict.[2] Sitting as a thirteenth juror, we will disturb a verdict only when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice.[3] The motion, however, is addressed to the discretion of the court, which should be exercised with caution, and the power to grant a new trial should be invoked only in exceptional cases in which the evidence preponderates heavily against the verdict.[4] Sanders does not dispute his role in killing his grandparents, but, rather, the finding that he was legally sane when he did so. In insanity defense cases, perhaps more than any other, a jury's verdict ought to be given great respect and deference.[5]

¶19. The Court of Appeals did not find merit in this assignment of error.[6] First, the Court of Appeals addressed the unusual circumstances of these seemingly inconsistent verdicts and the jury's asking whether Sanders could "walk as a free man" were he acquitted on the basis of insanity.[7] On the matter of inconsistent verdicts, the Court of Appeals said, "the fact that the defendant 'was found not guilty by reason of insanity should not have an effect on this

---

[2] *Bush v. State*, 895 So. 2d 836, 844 (Miss. 2005).

[3] *Id.*

[4] *Id.*

[5] *Laney v. State*, 486 So. 2d 1242, 1246 (Miss. 1986).

[6] *Sanders*, 2010 WL 780456, at *6.

[7] *Id.* at **4 -5.

Court's analysis of inconsistent verdicts.'"[8] The Court also noted the United States Supreme Court's precedent in **United States v. Powell** for the proposition that "[c]onsistency in the verdict is not necessary. Each count in an indictment is regarded as if it was a separate indictment."[9] And the record reveals that the jury acted within its purview despite the apparent inconsistent result, as the jury was presented with count-specific options regarding the form of the verdict and was allowed to choose one form for Count I and another for Count II. On the matter of the question from the jury, Sanders hints that the question is indicative of jury prejudice or bias. A jury is presumed to follow the instructions of the trial court.[10] The jury was properly instructed on the method for determining legal sanity. Sanders did not cite any authority for his assertion that "the jury's note clearly evinces that the jury chose to convict Sanders . . . in order to ensure that he would never 'be able to walk as a free man.'" Sanders, and our colleagues in the dissent, have engaged here in mere speculation, which we will avoid.

¶20.   In sum, the Court of Appeals said, "[w]hen analyzing the weight of the evidence that supports a jury's verdict, we are simply prohibited from considering, in any way, what the jury did on another count. It is irrelevant and immaterial. It is as if it never happened."[11] We agree with the well-reasoned analysis of the Court of Appeals on this point. We will not

---

[8] **Id.** at *4 (citing **Edwards v. State**, 797 So. 2d 1049, 1058 (Miss. Ct. App. 2001)).

[9] **Id.** (citing **United States v. Powell**, 469 U.S. 57, 62, 105 S. Ct. 471, 83 L. Ed. 2d 461 (1984)).

[10] **Johnson v. State**, 475 So. 2d 1136, 1142 (Miss. 1985).

[11] **Id.** at *6.

consider the jury's deliberation or its conclusions on another count of the indictment, because doing so would be speculative and unreliable. Like the Court of Appeals, we will examine the evidence presented at trial, as we would do in any other case in which the issue of weight has been raised.

¶21.    We are asked to determine whether the jury's determination that Sanders was legally sane was against the weight of the evidence. Mississippi follows the *M'Naghten*[12] Rule for determining legal sanity. Under the *M'Naghten* Rule, a defendant may not be held criminally liable for his actions at the time of the alleged crime if he "was laboring under such a defect of reason from disease of the mind that either (a) he did not understand the nature and quality of his act, or (b) if he did understand the nature and quality of his act, he did not appreciate that the act was wrong."[13] In applying this rule, the accused is presumed sane; and therefore, the burden is initially on the defendant to introduce evidence creating a reasonable doubt of his sanity.[14] However, once the defendant has overcome this initial burden, it is the State's burden to present sufficient evidence to prove the defendant's sanity beyond a reasonable doubt.[15] Though expert opinions frequently are used in cases in which the defendant claims insanity, expert opinions of psychiatrists are not conclusive upon the issue of insanity, which is, rather, a question to be resolved by the jury.[16]

----

[12]*M'Naghten*, 8 Eng. Rep. 718 (1843).

[13]*Stamper v. State*, 803 So. 2d 1194, 1197 (Miss. Ct. App. 2000).

[14]*Edwards v. State*, 441 So. 2d 84, 86 (Miss. 1983).

[15]*Id.*

[16]*Laney*, 486 So. 2d at 1245.

¶22. All three experts testified that they believed Sanders to have understood the nature and quality of his acts at the time. There is no indication in the record anywhere that Sanders did not understand that he was killing another human being. The only question is whether the evidence preponderates heavily against the jury's necessary determination that Sanders knew that the killing of his grandmother was wrong. On this point, there was conflicting evidence.

¶23. Dr. John McCoy, who treated Sanders at Mid-South, testified that Sanders was "the most mentally-ill patient" at the hospital and that he thought Sanders did not know right from wrong when he killed the Crawfords. Dr. Mark Webb testified that Sanders's paranoia had prevented him from understanding that his actions were wrong.

¶24. On the other hand, Dr. McCoy testified that Sanders had admitted that he was not hallucinating when he killed his grandmother. Dr. William Lott testified that, despite the fact that Sanders had not been medicated for schizophrenia for years, Sanders did not appear to be psychotic when Lott interviewed him in 2007. Dr. Lott further testified that symptoms of schizophrenia or schizoaffective disorder can "wax and wane," so diagnosed persons have periods of lucidity and know right from wrong. Further, the dying-declaration testimony of Elma was that her grandson had walked upstairs to her bedroom after killing her husband, had shot her, and then had hid the phone before leaving with the shotgun. Sanders then had eluded police for nearly twenty years. These facts and evidence suggest Sanders knew his conduct was wrong.

¶25.    In *Laney*, the defendant, who had shot a uniformed police officer, offered an expert witness who testified that he did not know that the killing was wrong at the time.[17]  And the record was uncontradicted that *Laney* was a diagnosed schizophrenic and allegedly believed that God had instructed him to shoot the officer.[18]  The expert witness testified, however, that he thought that the defendant knew that shooting a uniformed police officer was against the law and would meet with the disapproval of society.[19]  We would not reverse Laney's conviction, even though, according to testimony, he "knew that killing a man was wrong legally, but he felt if God commanded him to do this, that it was right."[20]  It has long been our law that "[a] man is not to be excused from responsibility, if he has . . . knowledge and consciousness that the act he is doing is wrong and criminal, and will subject him to punishment."[21]

¶26.    In *Yarbrough v. State*, we said that the issue of insanity is for the jury to determine, and that we must abide by its verdict.[22]  There, we affirmed the conviction and life sentence of a fifteen-year-old with a history of mental illness who had stabbed a classmate at school. And in *Hunter v. State*, where three experts testified that the defendant had believed his victim to be "the devil's wife," we declined to disturb the jury's finding of legal sanity,

---

[17]*Laney*, 486 So. 2d at 1246.

[18]*Id.* at 1245.

[19]*Id.*

[20]*Id.*

[21]*Bovard v. State*, 1 George 600, 1856 WL 2562, at *9 (Miss. Err. & App. 1856).

[22]*Yarbrough v. State*, 528 So. 2d 1130, 1130 (Miss. 1988).

saying, "[i]n the context of *M'Naghten* – given the fact that there is testimony on both sides of the issue -- a jury's verdict on the insanity issue is essentially conclusive and unreviewable."[23]

¶27. Sanders cites *Hawthorne v. State*[24] as an example in which we have reversed a jury determination of legal sanity. There, however, the appellant was able to produce eyewitnesses, who described his bizarre behavior contemporaneous with his crime, and the State produced no expert witness, while the defense produced several.[25] Even the State acknowledged in *Hawthorne* the record held little evidence to show that the defendant knew the difference between right and wrong.[26] In this case, there was ample, credible evidence on both sides of the *M'Naghten* issue from which the jury made a decision.

¶28. Despite the expert testimony of Drs. McCoy and Webb and Sanders's history of mental illness, there is reasonable evidence to conclude that Elma was slain in an effort to avoid responsibility for the death of W.D. and not in a paranoid delusion. Only after arguing with and killing his grandfather did Sanders proceed upstairs and shoot his grandmother. Then he pulled the phone from the wall and hid it under a sofa before fleeing the scene. Just because a person is schizophrenic does not mean that person is *M'Naghten* insane.[27] And, while no evidence of the circumstances surrounding this tragedy suggests that Sanders was

---

[23]*Hunter v. State*, 489 So. 2d 1086, 1090 (Miss. 1986).

[24]*Hawthorne v. State*, 883 So. 2d 86 (Miss. 2004).

[25]*Hawthorne*, 883 So. 2d at 87-88.

[26]*Id.* at 90.

[27]*Laney*, 486 So. 2d at 1245.

14

in a paranoid delusional state of mind on the morning of these killings, his calculated flight and evasion of authorities immediately thereafter show deliberation and a guilty conscience.

¶29.   In the past we have said that "the subjective aspects of sanity or insanity present difficult problems."[28]  This is especially true where, as here, the defendant has a documented history of mental illness.  However, the jury weighed the conflicting testimony of experts and Sanders's history of mental illness against his seemingly calculated flight.  After being properly instructed regarding the burden of proving whether or not Sanders was legally sane, the jury found him guilty.  To do so, the jury necessarily had to make a judgment concerning one of the most difficult questions of fact -- legal sanity -- with which a jury may be presented.  We are in no position to make a better judgment than the jurors, so we cannot say that Sanders's conviction was against the overwhelming weight of the evidence.  This issue is without merit.

**II.     Whether the circuit court erred in giving the State's jury instruction on flight.**

¶30.   Sanders's second assignment of error is that the trial court erred when it granted the State's instruction on flight:

> The Court instructs the jury that flight is a circumstance from which guilty knowledge and fear may be inferred.  If you find from the evidence in this case beyond a reasonable doubt, that the defendant, Keir D. Sanders, did flee from the scene of the death of W.D. Crawford, Jr. and the shooting of Elma Lee Crawford, then the flight of Keir D. Sanders may be considered in connection with all other evidence in the case.  You may determine from all of the facts whether the flight was from a conscious sense of guilt or whether it was caused by other things, and give it such weight as you think it is entitled to in reaching verdicts in this case.

---

[28] ***Hill v. State***, 339 So. 2d 1382, 1385-1386 (Miss. 1976).

The Court of Appeals found no error in the giving of this instruction. We agree with its learned analysis and adopt its conclusions of law.

> **III.  Whether the circuit court erred by requiring Sanders to serve the life sentence pursuant to Count II before being conveyed to the state mental hospital pursuant to Count I.**

¶31.    Sanders's third assignment of error is that the trial court erred in suspending his mandatory commitment to a state asylum for the insane under Mississippi Code Section 99-13-7[29] until completion of his sentence on Count II. The trial court is mandated to commit any person acquitted on the ground of insanity when the jury finds that the defendant has not been restored to reason and remains dangerous to the community.[30] Because the jury found for Sanders on Count I (but also found that he remained insane and dangerous), the trial court was required to commit him.[31] The Court of Appeals aptly noted that this mandate was mutually exclusive to Sanders's mandatory life sentence under our "habitual offender" statute (Mississippi Code Section 99-19-81)[32] as a consequence of his conviction on Count II of the

---

[29]Mississippi Code Section 99-13-7 (Rev. 2007) reads:

> When any person shall be indicted for an offense and acquitted on the ground of insanity the jury rendering the verdict shall state therein such ground and whether the accused has since been restored to his reason, and whether he is dangerous to the community. And if the jury certify that such person is still insane and dangerous the judge shall order him to be conveyed to and confined in one of the state asylums for the insane.

[30]*Id.*

[31]*Id.*

[32]Mississippi Code Section 99-19-81 reads:

> Every person convicted in this state of a felony who shall have been convicted twice previously of any felony or federal crime upon charges separately

indictment.[33] Because the "habitual offender" statute contains the additional mandate that "such sentence shall not be reduced or suspended," the Court of Appeals affirmed the trial court's sentencing order.[34]

¶32.  A person cannot be in two places at the same time.  The "commitment" statute for the criminally insane and the "habitual offender" statute each mandate that the court confine Sanders in mutually exclusive manners.  The latter, however, specifically prohibits the suspension of its mandate.[35] That prohibition is not absolute, but exceptions are exceedingly rare.[36] The trial court's order is in accord with the plain reading of these statutory provisions.

¶33.  The insanity statute is silent regarding whether mandatory commitment may be suspended to allow for simultaneous mandatory incarceration.  When a statute is ambiguous or doubtful, we invoke the doctrine of "*in pari materia.*"[37] When statutes are *in pari materia*, although apparently conflicting, they should, if possible, be construed in harmony with each

---

brought and arising out of separate incidents at different times and who shall have been sentenced to separate terms of one (1) year or more in any state and/or federal penal institution, whether in this state or elsewhere, shall be sentenced to the maximum term of imprisonment prescribed for such felony, and such sentence shall not be reduced or suspended nor shall such person be eligible for parole or probation.

Miss. Code Ann. § 99-19-81 (Rev. 2007) (emphasis added).

[33]*Sanders*, 2010 WL 780456, at *22 (citing Miss. Code Ann. § 99-19-81).

[34]*Id.* at *23.

[35]Miss. Code Ann. § 99-19-81 (Rev. 2007).

[36]*Cf. Clowers v. State*, 522 So. 2d 762, 765 (Miss. 1988).

[37]*James v. State*, 731 So. 2d 1135, 1138 (Miss. 1999).

17

other to give effect to each.[38]   The trial court's disposition is the only disposition which logically could give effect to the express prohibition in the "habitual offender" statute against suspending or reducing the criminal sentence.   Though it is a harmonious reading of the statutes, this result raises policy questions.   What are the purposes of these two separate forms of confinement, and which confinement is more important?   In *Michigan v. Webb*, the supreme court of that state considered a similar question.[39]   Webb killed his father and his father's friend contemporaneously and was convicted of the latter but acquitted of the former by reason of insanity.[40]   That court, interpreting its own mandatory commitment provision, said there was "no doubt that it is a measure to promote public safety.   Persons acquitted by reason of insanity, particularly where the facts are grave, cannot be allowed to simply walk out the front door of the courthouse."[41]   An Ohio court considering a similar question found the opposite to be true, saying that the legislature of that state had "clearly adopted the human principle that no person shall be either tried or punished while he is insane.[42]   The requirement of Mississippi's commitment statute that one found not guilty on account of insanity must be "dangerous to the community" to be committed suggests that its purpose is more for the protection of society than as a service to the perpetrator.   The plain reading

---

[38]*Atwood Chevrolet-Olds, Inc. v. Aberdeen Mun. Sch. Dist.*, 431 So. 2d 926, 928 (Miss. 1983).

[39]*Michigan v. Webb*, 580 N.W. 2d 884 (Mich. 1998).

[40]*Id.*

[41]*Id.* at 891.

[42]*Ohio v. Ware*, 542 N.E. 2d 1115, 1119 (Ohio 1988).

Section 99-13-7 reveals that if the jury had acquitted Sanders on both counts and had found him not to have been restored to reason, but had not found that he was a danger to the community, commitment under that statute would not have been mandatory. It might not have been authorized at all. If the Legislature has other purposes, besides societal protection, in mind for rare circumstances such as these, it may enact laws that so reflect. Furthermore, the Department of Corrections is equipped to treat the physical and mental ailments of its wards. Whether this treatment is adequate for Sanders is, certainly, not an issue for us at this time.

¶34. Despite the unusual circumstances of the sentencing order, we find that the trial court properly exercised its discretion in requiring Sanders first to serve his mandatory life sentence before his term of an indefinite confinement in a mental institution. This issue is without merit.

## CONCLUSION

¶35. Finding no error in the trial court's denial of the motion to grant a new trial, in its grant of the State's instruction on flight, or in its sentencing order, we affirm the judgment of the Court of Appeals and the Circuit Court of Tishomingo County.

¶36. **COUNT I: ACQUITTAL OF MURDER BY REASON OF INSANITY AND ORDER OF CONFINEMENT IN A STATE ASYLUM FOR THE INSANE, ORDER SUSPENDED, AFFIRMED. COUNT II: CONVICTION OF MURDER AND SENTENCE OF LIFE IMPRISONMENT, AS A HABITUAL OFFENDER, IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED. SENTENCE SHALL NOT BE REDUCED OR SUSPENDED NOR SHALL APPELLANT BE ELIGIBLE FOR PAROLE OR PROBATION. SENTENCE IN COUNT II SHALL RUN CONSECUTIVELY WITH THE ORDER IN COUNT I.**

**WALLER, C.J., CARLSON, P.J., RANDOLPH AND LAMAR, JJ., CONCUR. CARLSON, P.J. SPECIALLY CONCURS WITH SEPARATE WRITTEN OPINION**

19

**JOINED BY WALLER, C.J., AND LAMAR, J.; KITCHENS, J., JOINS IN PART. DICKINSON, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY KITCHENS AND CHANDLER, JJ. KITCHENS, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY DICKINSON, P.J., AND CHANDLER, J. KING, J., NOT PARTICIPATING.**

**CARLSON, PRESIDING JUSTICE, SPECIALLY CONCURRING:**

¶37.   While I join the majority opinion, I write separately once again to address in more detail the issue of giving the flight instruction. Although I agree with the majority's finding that the flight instruction was proper in today's case, I again caution against the use of the instruction. It must be emphasized that the (hopefully) rarely-used flight instruction should be requested, and granted, with prudence. As I have previously written:

> [T]he use of the flight instruction in this state can be described in one word -- "dangerous." In my years of experience as a trial judge, the flight instruction was very seldom requested by the prosecution and almost never given. It simply is not needed. While evidence of flight might be relevant, no legitimate purpose is served by the jury receiving an instruction from the trial court (which heightens the importance of the evidence in the eyes of the jury) highlighting for the jury the fact that the jury can consider evidence of flight as "a circumstance of guilt or guilty knowledge" when "that flight is unexplained and somehow probative of guilt or guilty knowledge." *See Reynolds v. State*, 658 So. 2d 852, 856 (Miss. 1995); *Fuselier v. State*, 468 So. 2d 45, 57 (Miss. 1985). The term "unexplained flight" is somewhat nebulous, anyway, and a trial court, by giving a flight instruction, simply puts itself in a position of possibly placing reversible error in an otherwise clean record. If a trial court persists in giving a flight instruction, I suggest that it do so with great caution.

*Randolph v. State*, 852 So. 2d 547, 567-68 (Miss. 2002) (Carlson, J., concurring).

¶38.   Likewise, we have stated that, although evidence of flight is admissible under Mississippi Rule of Evidence 404(b), this evidence ultimately must be filtered through Mississippi Rule of Evidence 403. *Shaw v. State*, 915 So. 2d 442, 447 (Miss. 2005). Admittedly, the trial court, as with all evidentiary decisions, is afforded considerable

20

discretion. *Id.* at 447 (citing *Foster v. State*, 508 So. 2d 1111, 1118 (Miss. 1987), *overruled on other grounds by* *Powell v. State*, 806 So. 2d 1069, 1080 (Miss. 2001)). However, there is this caveat: "[E]vidence of flight is inadmissible where there is an independent reason for the flight." *Id.* (citations omitted).

¶39. Keeping all of this in mind, I again emphasize that great caution should be used when the prosecutor submits, and the trial judge considers, a proposed flight instruction. Because of the possible prejudice associated with the instruction, there is a great risk for reversal if the instruction is improperly granted, despite what might be an otherwise error-free record.

¶40. Returning to today's case, the majority, by reference to the Court of Appeals' discussion on the issue of Sanders's flight, adopts that court's reasoning. My problem with this is that the Court of Appeals' discussion on this issue reveals that it considered Sanders's absence for twenty years as evidence of flight. *Sanders v. State*, __ So. 3d __, 2010 WL 780456, *19, ¶¶67-68 (Miss. Ct. App. Mar. 9, 2010). The Court of Appeals stated:

> Dr. [William] Lott testified that in his opinion Sanders's actions after the murders, i.e. unplugging and hiding the telephone, fleeing to a different state, using aliases to conceal his identity, indicate knowing concealment and well-reasoned behavior. Therefore, we find that the circuit court did not err in granting the prosecution's instruction on flight.

*Id.* at *19, ¶68. Certainly, some of this evidence was relevant to the issue of Sanders's flight from the scene immediately after the crimes; however, earlier in its opinion, the Court of Appeals had referenced Dr. John McCoy's testimony in response to a question concerning Sanders's absence for twenty years after the crimes were committed. *Id.* at *19, ¶67.

¶41. The purpose of the flight instruction is to inform the jury that it might consider the defendant's flight from the scene immediately after the commission of the crime as a

circumstance from which guilty knowledge might be inferred. While the prosecution understandably might wish to present evidence of a defendant's extended absence from the state and argue that fact to the jury (which the prosecutor would have every right to do, especially since the jury would be curious as to why it had taken more than twenty years after the crimes to bring a defendant to trial), the flight instruction in today's case was appropriate only to the extent of allowing the jury's consideration of the fact that Sanders had fled the scene of the crime immediately after the commission of the crimes. The difference in what the prosecutor can do, and what the trial judge can do via a written instruction to the jury, is the cold hard fact that when a trial judge instructs the jury on such matters as a defendant's flight, such action only "heightens the importance of the evidence [of flight] in the eyes of the jury." *Randolph*, 852 So. 2d 568 (Carlson, J., concurring).

¶42. In the end, however, even if giving the flight instruction in today's case was error, such error was harmless beyond a reasonable doubt inasmuch as the overwhelming weight of the evidence supported the guilty verdict as to the murder of Elma Sanders. *See **Kolberg v. State***, 829 So. 2d 29, 49 (Miss. 2002).

¶43. Having had my say once again on the dreaded flight instruction, I concur in today's majority opinion.

**WALLER, C.J., AND LAMAR, J., JOIN THIS OPINION. KITCHENS, J., JOINS IN PART.**

**DICKINSON, PRESIDING JUSTICE, DISSENTING:**

¶44. The jury found that Keir D. Sanders was insane when he entered the home of his grandparents, W.D. and Elma Crawford, and murdered Mr. Crawford in his kitchen. The

22

same jury then somehow concluded—with absolutely no supporting evidence—that, as he walked into the bedroom to murder Mrs. Crawford, he became sane. Then, according to the jury's verdict, at some point after the murders, but before the trial, Sanders entered a new state of insanity.[43] Interestingly, in order to return its bizarre verdict, the jury was required to violate the trial court's form-of-the-verdict instruction.

¶45.    And what evidence assisted the jury in diagnosing Sanders's mental roller coaster? It certainly wasn't the testimony of any expert. Sanders's experts testified he was insane when he committed *both* murders. The State's expert testified he was sane when he committed *both* murders. No expert testified—and the State did not even suggest—that Sanders was insane when he committed the first murder, but sane when he committed the second; and this is not surprising, since the record includes not a smidgen of evidence that would support such a theory. To be clear, while I do believe the record includes sufficient evidence for the jury to have found Sanders sane, it includes no evidence or expert opinion that he was insane, and then became sane. The evidence touching on the issue of sanity was the same for both crimes.

¶46.    During deliberation, the jurors sent the trial judge a note asking:

> What is the minimum sentence for someone that is found to be insane and a danger to the public? . . . . If the defendant is found "not guilty" by reason of insanity BUT is a danger to the public . . . [w]ill the defendant be allowed to ever walk as a free man on the street?

---

[43] According to law, "if the jury certif[ies] that such person is still insane and dangerous the judge shall order him to be conveyed to and confined in one of the state asylums for the insane." Miss. Code Ann. § 99-13-7 (Rev. 2007). In returning Sanders's verdict, the jury so found, which makes one wonder whether Sanders was competent to stand trial at all.

This note exposes the jurors' understandable fear that an insane Sanders might someday get loose, and almost certainly explains their irrational verdict. But juries are not free to speculate on an accused's sanity; nor are they free to find an insane defendant sane, solely for the purpose of keeping him off the street. Because the jury's verdict was supported by no fact or expert testimony, I would reverse it and remand this case for a new trial.

¶47. As a final comment, I must say I find it appalling that today, this Court sends off to prison – with no evaluation or treatment of any kind – a man who has been adjudicated insane.

**KITCHENS AND CHANDLER, JJ., JOIN THIS OPINION**.

**KITCHENS, JUSTICE, DISSENTING:**

¶48. Having concluded that the guilty verdict on Count II of the indictment was contrary to the overwhelming weight of the evidence, I would reverse Sanders's conviction and remand for a new trial. It is abundantly clear from the record, and indeed, from the majority's recitation of relevant portions of the well-documented medical history of Keir D. Sanders, that the accused in this sordid tragedy, from his early childhood, was plagued by serious mental illness for most of his life. Notwithstanding the occasional interruption of Sanders's bizarre thinking and aberrant behavior by brief periods of relative lucidity and rational conduct, the jury's verdict of not guilty by reason of insanity on Count I was amply supported by a great body of credible evidence, which in this case was the very same evidence upon which the jury reached a polar-opposite verdict on Count II. Because absolutely no proof was adduced to support a conclusion that Sanders's mental condition was any different when he shot his grandmother than it had been a few moments earlier when he

24

had shot and bludgeoned his grandfather, the jury's guilty verdict on Count II was against the overwhelming weight of the evidence. Therefore, I fully join Presiding Justice Dickinson's dissent, but write separately to explain more fully my reasons for dissenting.[44]

¶49. Prior to 1985, a multi-count indictment would not have been permitted in the State of Mississippi, with the exception of a few anomalies. *See generally **Stinson v. State***, 443 So. 2d 869 (Miss. 1983) (discussing the history of Mississippi case law regarding multi-count indictments). However, earlier in the same year that Mr. and Mrs. Crawford were brutally killed, this Court decided in ***Dixon v. State***, 465 So. 2d 1092 (Miss. 1985), that, where multiple crimes had the same elements, the same proof, and arose from the same transaction or occurrence, it was permissible to plead such crimes in a single, multi-count indictment. The next year, 1986, the legislature authorized multi-count indictments when it enacted Mississippi Code Section 99-7-2, and this Court duplicated the language of that statute when it promulgated Rule 7.07 of our Uniform Rules of Circuit and County Court (adopted effective May 1, 1995). The indictment in this case was returned after July 1, 1986, the effective date of Mississippi Code Section 99-7-2, and its multi-count character is controlled by the terms of that statute. Without this statute, a multi-count murder indictment would not have been proper, unless it had fully conformed to the guidelines laid down by this Court in ***Dixon***, 465 So. 2d at 1097.

¶50. Especially within the context of this case, it is significant that both the legislative and judicial authorization for multi-count indictments in Mississippi state court practice require

---

[44]I also agree with Presiding Justice Carlson's analysis concerning so-called flight instructions, and join his separate opinion to that extent only.

25

that the multiple offenses, if they are to be charged in a single grand jury indictment, be "based on the same act or transaction" or that they be "based on (2) or more acts or transactions connected together or constituting parts of a common scheme or plan." Miss. Code Ann. § 99-7-2(1) (Rev. 2007); URCCC 7.07. Inasmuch as the charging document on which the prosecution of Sanders is founded is a multi-count indictment, from the inception of this case in circuit court, the State necessarily was bound to the proposition that the two offenses with which Sanders was charged were "based on the same act or transaction," or that the two offenses were based on "two or more acts or transactions connected together or constituting parts of a common scheme or plan." Miss. Code Ann. § 99-7-2(1). If the State had not subscribed to one or the other of those propositions, then it would have been necessary for the prosecution for the Crawfords' deaths to have been founded upon two separate murder indictments, one for the death of each of the victims.

¶51. As the State obviously recognized, a multi-count indictment was appropriate in this case. The tragedy that unfolded at the Crawford home constituted one event at one location during one visit by one person against whom the grand jury returned one indictment. The evidence was to the effect that the perpetrator did not leave the Crawford home until fatal injuries had been inflicted on both victims, that a negligible amount of time transpired between the assaults upon the respective victims, and the same firearm was used to inflict gunshot wounds upon both of them. Though Sanders had, in the early stages of the proceedings, moved to sever the counts, he did not pursue that motion and, in fact, withdrew it. Thus, the prosecution, the defense, and the trial judge all proceeded on the basis that a multi-count indictment was proper, which is to say that it fit the criteria for such pleadings

26

initially laid down by this Court in **Dixon**, 465 So. 2d at 1097, then codified by the legislature in Code Section 99-7-2, and ultimately promulgated by this Court in Rule 7.07 of the Uniform Rules of Circuit and County Court Practice.

¶52.   Sanders gave timely notice that he would assert an insanity defense, and the State obviously was well prepared to respond to it.  Significantly, Sanders did not offer one defense to Count I and another to Count II.  Similarly, the State did not offer one set of witnesses to counter the insanity defense for one of the counts and another set of witnesses in opposition to Sanders's defense of the other.  After both sides had finally rested, the Court gave the jury a single set of instructions concerning the insanity defense, not one set of instructions applicable to Count I and another set applicable to Count II.

¶53.   Yet, despite their instructions to limit their findings to the guilt of the accused, the jurors concerned themselves with the disposition to be made of Sanders after the trial.  After the jury had retired and begun its deliberations, it sent to the trial judge the following written questions:

> What is the minimum sentence for someone that is found to be insane and a danger to the public?
>
> If the defendant is found not guilty by reason of insanity <u>BUT</u> is a <u>danger</u> to the public[,] will the defendant be allowed to <u>ever</u> walk as a free man on the street?

(Emphasis in original.)   The trial court properly declined to answer the jurors' queries, because, in this case, the disposition to be made of the defendant, whether he was convicted or found not guilty by reason of insanity, was not a matter that was within the province of the jury.  But, in what can only be described as an obvious attempt to build into their verdicts

27

a mechanism to assure that Sanders never walked "as a free man" again, the jurors returned irreconcilable, incongruous verdicts. In truth, there is a logical explanation, albeit illegitimate, for what the jury did in rendering its mind-boggling verdicts. The best indicator of the jurors' intent is found in their proffered but still-pending questions, whereby they sought to learn from the trial court whether there was any possibility that Sanders would ever leave the State's custody if he were found not guilty by reason of insanity. This jury–which unanimously and unequivocally concluded that Sanders indeed was not guilty by reason of insanity for the death of his grandfather, then ostensibly was led by the same evidence to find that he was guilty as charged concerning the death of his grandmother–sought to manipulate and maneuver Sanders into permanent, lifetime confinement.[45]

¶54. This Court does not favor illogical results, and the majority has come to an illogical resolution of this case. Believing, as I do, that the jury's verdict on Count II of the indictment was contrary to the overwhelming weight of the evidence that Sanders was mentally incapable of distinguishing right from wrong when he inflicted ultimately fatal wounds upon his grandmother, I would reverse his conviction and remand for a new trial.

**DICKINSON, P.J., AND CHANDLER, J., JOIN THIS OPINION.**

---

[45]The trial judge had no hesitation in joining this enterprise when he ordered Sanders to serve a life sentence before being treated for his mental illness.