# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2024-KA-00267-COA

**LATINA MARIE OATES A/K/A LATINA OATES**                    **APPELLANT**

**v.**

**STATE OF MISSISSIPPI**                                               **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 10/02/2023 |
| TRIAL JUDGE: | HON. DAL WILLIAMSON |
| COURT FROM WHICH APPEALED: | JONES COUNTY CIRCUIT COURT, SECOND JUDICIAL DISTRICT |
| ATTORNEY FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER BY: MOLLIE MARIE McMILLIN |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: DANIELLE LOVE BURKS |
| DISTRICT ATTORNEY: | BRAD THOMPSON |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 03/03/2026 |
| MOTION FOR REHEARING FILED: | |

**EN BANC.**

**WEDDLE, J., FOR THE COURT:**

¶1.     After finding that Latina Oates was legally sane at the time she murdered her eleven-year-old son, Joshua, a Jones County jury convicted Oates of capital murder. The Jones County Circuit Court sentenced Oates to life imprisonment in the custody of the Mississippi Department of Corrections (MDOC) without eligibility for parole. On appeal, Oates argues that the State failed to produce sufficient evidence of her sanity at the time she committed the murder, the verdict was against the overwhelming weight of the evidence of her insanity, and the circuit court erred by admitting a gruesome autopsy photo. Upon review, we find no

reversible error. We therefore affirm Oates's conviction and sentence.

## FACTS

¶2. On March 17, 2020, a housekeeper for the Hampton Inn in Laurel, Mississippi, found the body of eleven-year-old Joshua on the bathroom floor of room 319. When law enforcement arrived, they entered the bathroom to find a bloody scene with evidence of a struggle. Joshua's head was covered with a black scarf-like material. When the officers lifted the fabric, they saw a steel rod sticking through Joshua's head.

¶3. After discovering receipts left behind in the hotel room, the officers reviewed surveillance footage from the places listed on the receipts. The footage showed a woman with three young boys accompanying her. The officers later identified the woman as Oates and the three young boys as her sons: Joshua, age eleven; Jack, age nine; and Matt, age six.[1] In light of what they had discovered inside the hotel room, the officers feared for the safety of both Jack and Matt. After obtaining a license plate number for Oates's vehicle, the officers worked with other jurisdictions to issue an emergency alert for Oates's two youngest sons and her vehicle. Around 6 p.m. on March 17, 2020, a tag reader identified Oates's vehicle, which was traveling south on Interstate 59 in Louisiana. Louisiana law enforcement learned that Oates's cell phone had been connecting to towers around New Orleans, and they began patrolling the area looking for her. The next morning, the officers located Oates's vehicle parked on the street of a residential neighborhood. Oates and her two youngest sons, who remained unharmed, were inside the vehicle. The officers took Oates into custody, and

---

[1] To protect their privacy, we use pseudonyms for the names of Oates's two youngest sons.

2

the children were taken to a child advocacy center for interviews.

¶4.     When Sergeant Nicole Barbe of the Louisiana State Police arrested Oates, she heard Oates remark that she "knew why [law enforcement was] there, and she didn't mean to do it." While awaiting extradition to Mississippi, Oates made two phone calls to her husband, Mark, who was in Ohio where they lived. The State would later play recordings of both phone calls for the jury at trial. During the first phone call, Oates asked if Mark had a way to get the two youngest boys and if he would drive her vehicle back to Ohio. Oates warned Mark that he would need gas, and she asked him to bring socks and underwear with him. When Mark said he was trying not to cry, she said, "I know. And I'm not going to try to hold you here by any stretch of the imagination." Mark asked Oates about the death penalty, and Oates responded, "Stop worrying. Please stop worrying. When I get to court in Laurel, . . . I will let you know. . . . God's got you. He's got you and the boys."

¶5.     During the second phone call, Oates stated that she wanted to make sure Jack and Matt were okay. Oates told Mark, "I know you don't understand. . . . That was not Joshua. I seen it in the eyes. . . . I would not have done that if I didn't feel in my spirit . . . just know that. . . . It's crazy cause you know how I feel about all the kids. I love the kids."

¶6.     In Laurel, local law enforcement continued to process the crime scene at the Hampton Inn. Officer Abraham McKenzie with the Laurel Police Department discovered what appeared to be blood stains on one of the beds in room 319 and larger amounts of blood in the bathroom. Two hoodies—one blue and one black—had been left on the bedroom floor. The officers obtained surveillance footage from a gas station in Laurel that showed Joshua

3

wearing the blue hoodie and Oates wearing the black hoodie. Officer McKenzie also noticed there was an opened bottle of NyQuil cold medicine in the hotel room, and officers found a receipt showing that the NyQuil had been purchased around 4:30 p.m. on March 15, 2020, which was two days before Oates murdered Joshua.

### A. Oates's Interactions with Law Enforcement

¶7. Oates waived extradition to Mississippi. Officer McKenzie, along with Investigator Brad Gruning, transported Oates to Laurel for an interview. Officer McKenzie testified at trial that Oates was "totally calm" during the drive and took a nap in the back seat. Officer McKenzie saw no reason to fear that Oates would hurt him or herself. Oates waived her *Miranda* rights[2] and gave law enforcement a voluntary statement.

¶8. In her interview with Officer McKenzie and Investigator Gruning, Oates claimed that a "change" in her started in January 2020. Oates stated the change had been "a spiritual thing" that was "hard for people to understand." Oates told Officer McKenzie that she was meditating one day during the full moon when she felt a spirit overcome her with feelings of "a mother's love" and that this spirit was an ancestor guiding her through voodoo. Oates informed Officer McKenzie that she knew then that the feeling was real.

¶9. Oates claimed that by the next full moon, which occurred the following month in February 2020, she had been "blessed" with more discernment and the ability to look into other people's eyes and know their souls. By the third full moon, which occurred in March 2020, Oates was attempting to learn more about her ancestors and voodoo. Oates told

---

[2] *Miranda v. Arizona*, 384 U.S. 436 (1966).

Officer McKenzie that the spirits had revealed to her that she was a descendant of Marie Laveau.[3] Oates claimed she was preparing to be the new reincarnation of Marie Laveau.

¶10.    Officer McKenzie asked about the metal stake that Oates had used to kill Joshua. Oates responded that she had seen the metal stake in her sons' bedroom one day, and she learned that her son Matt had found it. Oates said that when she first picked up the stake, she felt power flowing through it. Oates stated that the power she felt was so intense because the stake had once been used to kill demons during a time of settlement by Native Americans. Oates claimed the spirits later told her that she needed to drive to the South to get closer to "her people" and to take her children and the stake with her. Oates asked Matt to carry the stake to the car because the spirits had told her that Matt was a "pure spirit." Officer McKenzie asked if Oates knew what she would do with the metal stake when she packed it. Oates denied knowing that she would use the stake to kill Joshua. She instead placed full responsibility on the spirits by stating that they had told her she was supposed to take the stake with her.

¶11.    Oates said that she could tell on the drive that there was a demon inside Joshua. Oates told Officer McKenzie that she could see the demon in Joshua's eyes. According to Oates, the demon was very strong and could only be killed by a person who truly loved Joshua.

¶12.    Oates claimed that she had noticed a few changes in Joshua. Oates stated that sometimes Joshua drew demons and had started being mean to Matt. While they were in Laurel, Oates took the boys to see a movie about Sonic the Hedgehog. Oates noticed that

---

[3] Multiple witnesses explained at trial that Marie Laveau was an historical figure closely associated with voodoo and magic in New Orleans.

Joshua kept talking about how it was "cool" that Sonic was a "blue devil."

¶13. Oates said she did not remember everything that happened during Joshua's murder. Oates insisted that she had not killed her son but had only killed a demon. Oates told Officer McKenzie "that was not [her] son," and she said that she "believe[d] in God" but knew that she lived in a world where she could not fully explain that she had killed a demon because people would say she was the demon.

¶14. Oates told Officer McKenzie that she remembered the spirits had told her to run bath water. Oates gave the children NyQuil and tried to wait for Joshua to fall asleep. She said that she tried to carry Joshua to the bathroom, but he fought her. Oates said that "he was so strong" and described their fight as a "war." Oates said that the water in the bathtub had turned black because the demon inside Joshua was really strong. Oates claimed that the spirits had revealed to her that she was the only one who could kill the demon. Oates told the officers that she had to protect her other two sons and that killing the demon inside Joshua "was the hardest thing I have ever done in my life." Officer McKenzie asked if there was a part of Oates that realized her actions had been wrong, and Oates responded, "[T]o kill an eleven-year-old, to kill anyone, is wrong. But to let a demon that strong live . . . ."[4] Oates stated that she knew it was "very wrong" to kill a "human being child that was not a demon."

¶15. Oates said that Joshua promised her that he was not evil, but Oates claimed that Joshua's eyes were not his eyes because they had turned black. Although the spirits had told Oates to get the stake into Joshua's heart or head, Joshua was too strong for her to drive the

---

[4] Oates trailed off at this point in her statement.

stake into his chest. Oates stated that during the fight, she pushed Joshua into the bathtub. According to Oates, the water seemed to incapacitate Joshua, which allowed her to throw him from the bathtub before she started hitting him with the stake. Oates said that she continued to hit Joshua, but he was too strong for her. Joshua tried to take the stake from Oates, but she hit him harder until he fell. Oates stated that Joshua was "still fighting," so she continued to hit him until she was able to drive the stake through his skull. Oates claimed that the spirits said she had to keep going and that the death had to happen. Oates said that her ancestors gave her the physical strength to push the stake through Joshua's skull.

¶16. Oates stated that afterward, she left the bathroom and reassured her younger two boys that everything was okay. She explained to them that Joshua had to stay inside the bathroom. Oates let the younger boys go to sleep. When they later woke up and needed to use the restroom, Oates made them urinate in empty plastic bottles to prevent them from entering the bathroom.

¶17. Oates claimed that the energy inside the hotel room was "terrible." After she slept for a while, she knew that she needed to go to New Orleans to be closer to her ancestors. Oates drove around New Orleans trying to find someone who practiced real voodoo. She was disappointed that everything seemed to be commercialized and not a real religion. Oates stated the spirits eventually led her to a house and told her to knock on the front door, which she did. She was not allowed inside. Oates said that the spirits then told her to get into the car and wait, which she did. Soon afterward, officers arrived and arrested Oates.

¶18. Oates told the officers that she had not talked to her mother about the spirits because

7

she knew her mother would say Oates was schizophrenic. Oates said that she "clearly" knew it was a spiritual thing, not schizophrenia. Oates said she had done what God sent her to do.

¶19.   Investigator Michelle Howell interviewed Oates after Officer McKenzie. Investigator Howell testified that she had experience with people who were in mental distress and had training on how to handle those situations. Investigator Howell stated that she saw no signs of mental distress in Oates. Investigator Howell described Oates as cold and unemotional, and she stated that Oates shed no tears during their interview.

¶20.   On cross-examination, Investigator Howell acknowledged that Oates "started getting riled up" when Investigator Howell failed to acknowledge the "demon story [Oates] was telling." Investigator Howell agreed that Oates's demeanor shifted from calm to angry when Investigator Howell challenged some of Oates's statements about demons.

¶21.   During her interview with Oates, Investigator Howell asked about Oates's purchase of NyQuil on March 15, 2020, two days before Oates killed Joshua. Oates admitted that she bought the NyQuil because she knew that she had been called to kill the demon inside Joshua. When Investigator Howell expressed skepticism at Oates's claims, Oates became agitated. Oates stated, "I sacrificed everything for my children. All three of my children. Only God up above could make me do a thing like that. All I had was my three sons."

¶22.   Investigator Howell asked if Oates felt like she could have made another choice, and Oates responded, "My son wasn't in him anymore . . . a demon took over. . . . I would have died for my son any day if I really believed that was my son."

### B.   Jack's and Matt's Forensic Interviews

8

¶23.   A forensic interviewer from the New Orleans Child Advocacy Center testified that she interviewed Jack and Matt the day after Joshua's murder. The videos of the boys' interviews were played for the jury. During the interviews, the boys stated that Oates had told them that they had driven to New Orleans from Ohio because their ancestors were in New Orleans.

¶24.   Jack stated during his interview that Joshua had stayed behind at the hotel because he "was trying to fight us" and that Oates "took care of it." Jack said that Oates had been jumping on Joshua and that Joshua was crying. Oates and Joshua started fighting on the bed and then moved to the bathroom. Jack stated that Joshua was in the bathroom because Oates did not want the younger two boys to get sad. Jack heard Oates screaming, but he could not see into the bathroom. Jack stated that he never saw Joshua exit the bathroom, and Oates would not let either him or Matt go into the bathroom because she did not want Joshua to fight them. After the fighting stopped, Jack said that he, Matt, and Oates watched television. Jack stated that Oates talked to him and Matt about God and hearing voices.

¶25.   Matt stated during his interview that Joshua was alone at the Hampton Inn in Mississippi, but Matt could not remember what Oates had said about leaving Joshua at the hotel. As a result, Matt told the forensic interviewer that he did not know what Joshua was doing at the hotel.

¶26.   Matt said that he last saw Joshua inside the hotel room and did not see Joshua exit the bathroom. Matt stated that he could hear Oates and Joshua talking about Joshua trying to hurt Matt and Jack and that Joshua denied trying to hurt them. When Oates left the bathroom, Matt saw blood on her forehead, and she was wet. Matt said he also saw some

blood on Joshua's bed, which Matt thought might have gotten on the bed when Joshua and Oates were fighting and punching each other.

¶27. In addition, Matt saw blood on the floor under the bathroom door. He said, however, that he had not gone inside the bathroom and did not see Joshua. Matt thought that Joshua might have gotten hurt "everywhere." Matt said that he heard yelling and crying. Specifically, Matt heard Joshua scream, "I don't understand why you're doing this." Matt also heard Joshua crying before Joshua went silent.

### C.     Joshua's Autopsy Results

¶28. Dr. Mark LeVaughn performed Joshua's autopsy. Dr. LeVaughn found no internal injuries to Joshua's organs but noted "numerous abrasions, numerous contusions, [and] . . . numerous lacerations" to Joshua's body. Joshua's injuries included the puncture wounds to his scalp and skull and the metal rod that Oates had shoved through Joshua's skull into his brain. In all, Dr. LeVaughn found ten puncture wounds on Joshua's skull and "multiple" puncture wounds on his brain. An x-ray revealed that the metal bar punctured two to three inches into Joshua's head. The x-ray also revealed other penetrating fractures on Joshua's brain, which suggested that Oates had made multiple thrusts to Joshua's head. In addition, Dr. LeVaughn noted several "defensive" wounds on Joshua's hands and arms, which suggested that Joshua had been alive and conscious during the attack.

### D.     Oates's First Mental Evaluation

¶29. Dr. Criss Lott testified for the defense as an expert in clinical and forensic psychology. Dr. Lott performed a mental evaluation on Oates in late 2021, over a year after Joshua's

murder. Dr. Lott explained that when he determined sanity, he looked at the past: what was the defendant thinking at the time of the crime. To assist in his determination, Dr. Lott looked at Oates's medical history, spoke to her husband and mother, and reviewed some of the evidence against her. Dr. Lott admitted, however, that he did not review either Jack's or Matt's forensic interviews following Joshua's murder.

¶30. As stated, both Oates's husband and mother spoke with Dr. Lott. They told Dr. Lott that emergency services had been called to Oates's home in Ohio a few weeks before Joshua's murder. Oates had refused to let her mother inside the house because she thought her mother was a demon or devil.

¶31. Dr. Lott testified that Oates was of average to above-average intelligence. He said that on her personality testing, Oates "had elevations on scales that suggested she was exaggerating her psychological problems, primarily in terms of psychotic content and affective or emotional content," which included whether she heard voices or "sees things." Dr. Lott explained, however, that the results for malingering based on that report were so high "because [those symptoms] are so infrequent [among the general population]. . . . So the fact that she had elevations on those scales doesn't rule out the fact that they're not genuine." Dr. Lott testified that he did not think Oates was faking "at all" or feigning any of her symptoms. On cross-examination, Dr. Lott agreed, though, "that defendants entering an insanity plea may be more likely to malinger mental ill[ness] symptoms than patients seeking treatment[.]"

¶32. Oates told Dr. Lott that she started hearing voices in January 2020. Oates further told

Dr. Lott that she heard the voice of God and that she had received visions. Dr. Lott found that Oates had a fixation with both numbers and Marie Laveau.

¶33. Oates told Dr. Lott that Joshua had spent the night with a friend the night before she drove her sons from Ohio to Mississippi. According to Oates, when she picked up Joshua, God told her that the friend's house was full of witches and warlocks. Oates stated that she became worried about Joshua. Oates said the voice then told her to drive and that she could not stop. Oates drove with her sons straight to Laurel. She told Dr. Lott that she saw demons and spirits on the road the entire way to Mississippi.

¶34. Oates also told Dr. Lott that during the Sonic the Hedgehog movie, the voices started telling her that Joshua was becoming a devil and that his friend had been teaching him to become a warlock. When Oates and her sons returned to their hotel room, the voices told her to get the stake out of her car. Oates retrieved the stake, and when she returned to the hotel room, she saw that Joshua was a "full-fledged demon." Oates claimed that she did not remember everything, but she remembered going into the bathroom with Joshua. Oates told Dr. Lott that Joshua's eyes had turned red. Oates filled the bathtub with what she said was holy water so she could deactivate the demon before killing it.

¶35. Dr. Lott explained that Oates was very clear that she was trying to kill the demon rather than Joshua. Dr. Lott testified that Oates said, "I don't remember all what happened. I just know he wasn't my son." Oates told Dr. Lott that God had told her that she had to kill the demon so he would not kill her son Jack, who was Jesus Christ reincarnated. Oates told Dr. Lott that it was wrong to kill a child. She also told Dr. Lott that she loved her children

12

and had no reason to harm them. Oates explained, however, that she had believed she was killing a demon, not her son.

¶36. Oates told Dr. Lott that God had told her that after she killed Joshua, Jesus would come pick up her and her other two sons. Oates explained that they waited, but Jesus never showed up. Oates then decided to go to New Orleans to find out more about Marie Laveau. Oates informed Dr. Lott that God told her to trust and follow Him. She stated that she stopped outside a house where God wanted her to be. Oates told Dr. Lott that she waited for God to send someone, but instead the police came and arrested her. On cross-examination, Dr. Lott acknowledged that his interview with Oates appeared to be the first time she had ever mentioned "needing" to go to New Orleans and that before the murder she had told her husband that her final destination was Mississippi.

¶37. Dr. Lott believed that, at the time of Joshua's murder, Oates suffered from a severe mental health disorder because she genuinely believed that Joshua was a demon she must kill. Dr. Lott believed that Oates needed hospitalization, careful monitoring, psychiatric treatment, and medication.

¶38. Dr. Lott testified there was a history of schizophrenia in Oates's family medical history and that Oates was "heavy laid for it genetically." Dr. Lott admitted that using drugs, such as marijuana, could exacerbate psychotic symptoms and that Oates had been using marijuana around the time of Joshua's murder. Even so, Dr. Lott stated that he did not think marijuana use had caused Oates's symptoms.

¶39. Dr. Lott testified that it was not unusual for other people to be unable to tell that Oates

13

was suffering from hallucinations and delusions. Dr. Lott stated that Oates did not show much emotion during their interview. He stated that sort of "blunted affect" was common in chronically mentally ill people. Dr. Lott noted that Oates did cry on several occasions, particularly when talking about Joshua. Dr. Lott did not feel that Oates was trying to make up a story or pretend that she did or did not have delusions. Dr. Lott testified that Oates cried and explained that she had been told that Joshua was a demon and that she had to kill him to protect her other children. Oates told Dr. Lott that she did not know at the time that "the voices weren't real," though she now knew the voices were just delusions. On cross-examination, Dr. Lott admitted that even mentally ill people "typically do" choose whether to obey or not obey the "command" hallucinations they experience.

¶40. Dr. Lott summarized his findings on Oates as follows:

> [Oates] was suffering from a severe mental disorder at the time of the offense. . . . [S]he knew the nature and quality of her actions inasmuch as she knew that this was a stake, and that she was killing what . . . she perceived to be a devil. And she knows that it's wrong to kill a child[, but] she believed that she was killing a devil, and she did not believe that her actions were wrong.

### E. Oates's Second Mental Evaluation

¶41. The State moved for an additional mental evaluation of Oates, which Dr. Robert Storer conducted. Although Dr. Storer performed his evaluation following the State's motion, he testified at trial as a defense witness. The circuit court accepted Dr. Storer as an expert in clinical and forensic psychology. Dr. Storer evaluated Oates on March 16, 2023, nearly three years after Joshua's murder. As a result, Dr. Storer had access to additional information that Dr. Lott did not have at the time of his evaluation, including letters that

14

Oates had written to her husband, jail records, and records from another mental health facility.

¶42. Dr. Storer explained that he thought of an insanity evaluation as a three-part assessment of the following questions:

(1) Does the defendant have a genuine mental disease or defect?

(2) If so, did the symptoms interfere with the defendant's ability to know the nature and quality of his or her acts?

(3) Did the symptoms interfere with the defendant's ability to know the wrongfulness of his or her actions?

¶43. During the evaluation, Oates told Dr. Storer that she had started hearing voices in January 2020 after her deceased grandmother spoke to her. Oates stated that a friend recommended she meditate on her grandmother's voice under the full moon, which was when the voices first told her that she was actually Marie Laveau. Oates told Dr. Storer that she believed these voices were real and that she was special because God had allowed her ancestors to speak to her.

¶44. Around this same time, Oates saw a counselor, but she did not mention the voices to the counselor. Oates explained that the voices told her that she could not tell the counselor because he was white. Dr. Storer noted that many of Oates's delusions centered around racial relations and identity. Similarly, Oates had not told emergency medical technicians (EMTs) who came to her house a few weeks before the murder about the voices because she believed the EMTs were demons who wanted to take her away.

¶45. Dr. Storer testified about an incident that Oates had related to him that he was later

15

able to confirm with Oates's friend named Tay. In February 2020, Oates stated the voices told her that she needed to save Tay by bringing Tay to Ohio to be blessed. Oates drove to Chicago, Illinois, where Tay lived. She begged Tay to come to Ohio to save Tay's soul. Oates said that she was crying and pleading but that Tay had plans and could not drive to Ohio. Oates explained the voices had told her that if Tay did not come to Ohio, then Tay would be erased from the "Book of Life." Oates stated that the voices told her about a Book of Life with people's names in it, and if a name was erased by the voices, then Oates could no longer communicate with that person.

¶46. Oates told Dr. Storer that in March 2020, Jesus told her that she had to get her kids out of hell (Ohio) and return to Laurel because that was where her ancestors had lived. Oates took the two younger children with her to pick up Joshua, who had spent the night at a friend's house. When Oates arrived to pick up Joshua, she had some trouble getting someone to answer the door, and the voices started telling her that Joshua had stayed the night with witches and had been corrupted.

¶47. Once Oates picked up Joshua, she drove south for ten hours. Oates told Dr. Storer that the entire way to Laurel, the interstate was lined with ghosts who refused to look at her. Oates stated that she thought the ghosts were there to taunt her. Oates told Dr. Storer that she had been communicating with her cousin through her mind and that her cousin was supposed to meet her at a gas station in Laurel. Oates went to the gas station and looked for her cousin, but her cousin was not there. Oates said the visions then showed her that her cousin had been erased from the Book of Life.

16

¶48. Oates told Dr. Storer that she found a hotel for the night. Oates stated that the next day, she tried to find an area to bury "the cursed dagger" (the metal stake) that Matt had found in Ohio. Oates believed that the stake had been used to kill ancient demons and that it was her job to get rid of the item. Dr. Storer said he asked why Oates had not gotten rid of the stake in Ohio, and Oates explained that she was supposed to find Native American land. Oates stated that she was unable to find the appropriate spot in Mississippi, however, so the voices told her to "hold on to it for now."

¶49. Oates later took her sons to see a movie about Sonic the Hedgehog. During the movie, the voices started telling Oates about a blue devil that was coming to attack her. Oates stated that she kept going to the bathroom at the theater to "touch stone" because the act cleared her head of the voices.

¶50. Dr. Storer sometimes asked Oates about inconsistencies in her story, but he testified at trial that none of the inconsistencies raised a lot of concern for him. On cross-examination, the State thoroughly questioned Dr. Storer about the inconsistencies in Oates's prior statements. Dr. Storer acknowledged there was medical documentation showing some inconsistency in Oates's reporting about when she first began hearing voices. In addition, Dr. Storer acknowledged that other aspects of Oates's story had changed over time. For example, when Oates was first arrested, she made a comment to the effect that she knew why law enforcement was there and that she had not meant to do it. During her interview with Dr. Storer almost three years later, however, Oates claimed that her arrest had surprised her because she had not believed that she had done anything wrong.

17

¶51. In addition, Dr. Storer asked Oates about her purchase of the NyQuil that she had given to her children. Oates originally told law enforcement that she had bought the NyQuil to help her children sleep. But when Dr. Storer asked Oates about purchasing the NyQuil, Oates responded that she had bought the NyQuil to help her sleep. Oates later stated, however, that when she and the children arrived at the hotel, she had decided to use the NyQuil to help the children rest as well.

¶52. Dr. Storer explained that during their evaluation, Oates was very blunted and dull, which was typical of people suffering from a major mental illness. Dr. Storer stated that Oates also cried "quite a bit" when talking about her hallucinations and beliefs around the time of Joshua's death. Dr. Storer testified that Oates now recognized that the voices had not been real.

¶53. Oates told Dr. Storer that she and the children were having a good time together prior to Joshua's death. When they got back to the hotel, she went to her car to smoke—maybe marijuana, but certainly a cigarette—and while she was outside, the voices told her to get the stake from the car and create some holy water. Oates returned to the hotel room and put some water in the bathtub. She then put her hands in the water to clean them. Oates stated that the voices told her to urinate and then put her urine in the bathtub as well. Oates explained that after she completed these actions, the voices told her that Jesus was taking Joshua to heaven because a demon had taken over Joshua's body.

¶54. Oates told Dr. Storer that Joshua's eyes were red and that she was scared. Oates stated that Joshua was also making a growling noise. Oates claimed that the voices told her

18

to use the "ancient dagger" against Joshua because he was no longer her son but a demon.

¶55.    At trial, Dr. Storer read the following portion of Oates's narrative:

> I remember us wrestling on the bed, and I was trying to pierce the heart because the voices told me the only way the demon would die was to pierce it in the heart or in the brain. Somehow we ended up in the bathroom. I don't really remember how. Then at some time along this time, while we were in the bathroom, I had a rosary. My rosary broke apart, and there were two crosses, and they were facing upside down. Well, one was upright, and then I seen it turn to be upside down, indicating that there was a demon in the room. So I got scared. And I remember pushing him in the water because it was holy water, and I wanted to subdue him. And I don't really remember too much after that.

¶56.    Oates told Dr. Storer that she thought Joshua "was already gone" when she was killing what she believed to be a demon. Oates further told Dr. Storer that after the demon was dead, she waited in the room for Jesus to come. Oates did not run, and she was surprised when no one came to get the body. Oates stated that the voices then told her to leave the hotel room and leave Joshua's body behind for someone to get. Oates explained that she was surprised when she was arrested because the voices had told her to go to that particular house.

¶57.    Oates told Dr. Storer that she no longer believed Joshua had been a demon but that she had not realized that in May 2020. Oates told Dr. Storer that in May 2020, she heard God tell her that he would live on the moon with her, Matt, and Jack. Later, God told Oates he would live on the moon with just Matt; then, it was just her (Oates), and then it was just God alone. Oates stated that "all of a sudden something clicked in me, like I think something's wrong with me." Dr. Storer testified that although the nurse at the jail reported that Oates had no hallucinations around this time, letters that she was writing to her husband still spoke

19

of demons and speaking to God.

¶58. Dr. Storer was questioned about a note in Oates's records from Pinebelt Mental Health Services, which suggested that Oates's mother may have coached Oates or interfered with Oates's medical treatment while she was in prison. Dr. Storer read the note to the jury during his testimony. The note stated the following: "Jail staff reported that [Oates] has been prescribed medications by the nurse practitioner at the jail, but [Oates] will take the meds and then speak to her mother and will immediately discontinue the meds or ask for a decrease in dosage after [Oates] speaks with her mother."

¶59. Dr. Storer testified that he was initially concerned by the medical note, and he said that the note made him "a little more skeptical and a little slower to come to the decision that [Oates] is and was genuinely mentally ill." Dr. Storer could not say with certainty whether Oates's mother was "coaching" Oates to say certain things about her delusions, but he testified that even if that were the case, he was "convinced that [Oates was] genuinely mentally ill."

¶60. Dr. Storer agreed with Dr. Lott that Oates suffered from a mental illness or defect. Dr. Storer did not agree, however, that Oates understood the nature and quality of her actions. Dr. Storer testified that although Oates had a weapon in her possession, she believed it was an ancient dagger. Dr. Storer also testified that although Oates knew she was "killing," she did not believe that she was killing her son. Dr. Storer believed those facts indicated that Oates did not know the nature and quality of her actions. Additionally, Dr. Storer did not believe that Oates knew or understood the wrongfulness of her actions. Dr. Storer concluded

20

that there was nothing logical or rational about the offense, and he found no evidence of an inciting event that caused her to want to kill Joshua. Moreover, Dr. Storer opined that Oates had made no attempt to hide or avoid capture.

¶61. Despite his own conclusions about Oates's awareness about the wrongfulness of her actions at the time she murdered Joshua, Dr. Storer acknowledged that he had previously made incorrect determinations regarding the issue and that "psychology is not an exact science . . . ." Dr. Storer explained that when given the circumstances of the present case, as many as half of the psychologists questioned might differ "on the opinion of whether [Oates knew the] nature and quality" of her actions. In fact, Dr. Storer testified that he had recently asked five colleagues the following hypothetical: "[I]f somebody thought their child was a demon, genuinely believed that and killed [the demon] under instructions from God because they believed this demon was going to do something[, w]ould you opine that they knew [the] nature and quality of the act or that they did not?" Given the limited facts presented to them, four of Dr. Storer's colleagues would say the person did not know the nature and quality of his actions, while the remaining colleague would still find that the person knew the nature and quality of his actions. Dr. Storer stated, however, that the lone colleague (who would find the hypothetical person knew the nature and quality of his actions) had thirty-five years of experience and was well respected. As a result, Dr. Storer concluded, "I feel like I have to say, you know, this is something you could certainly get a different opinion on."

F.     Mark's Trial Testimony

21

¶62.   Mark testified that he and Oates married in 2012 and had three children.  Mark described their marriage as "fine."  In 2016, the couple separated but still needed to live together due to financial difficulties.  By 2018, however, Oates and the children were able to move to a different home.  During that period, Mark testified that things were good between him and Oates and that he was able to see the children often.

¶63.   In January 2020, Oates invited Mark to her house for dinner.  Oates informed Mark that her grandmother had told her during a dream that it would be good for Mark to be with the kids.  Mark testified that he was initially upset because he had begun to accept that the marriage was over and because he had a soft spot for Oates's grandmother.  Despite his initial reaction, Mark moved in with Oates and the children.  Mark stated that Oates's revelation about her dream had not shocked him because Oates had always had vivid dreams.

¶64.   Once Mark moved into Oates's home, Oates started sharing more with him about her visions.  Oates told Mark about a time when she had been meditating and her body started moving oddly.  Another time, Oates told Mark about a cloud forming before her and a man sitting on the bed and said that she knew the man had been God.  Mark testified that Oates had always been a Christian, but "not to this extent."  Mark stated that he was not really concerned because Oates seemed happier, and he did not think her closer relationship with God would do more harm.

¶65.   Mark testified that he was running errands one day when Oates called him in a panic.  Oates thought that Mark was plotting to take the children away from her.  Mark testified that he was confused by Oates's phone call, and he returned home to see what was happening.

When he got home, Oates continued to accuse him of trying to take the children from her. Mark gave Oates his phone to prove that nothing was wrong. Once Oates looked through his phone, Mark testified that "it was as if she came back to reality[,]" and she was "shocked" that she had been wrong.

¶66. Shortly after this incident, Oates refused to leave the house. Oates claimed that she "wasn't allowed outside . . . due to the negative energy." At other times, Oates would tell Mark about all the information she had "learned" from the voices she heard. Mark testified that despite Oates's revelations, he was not afraid of her and did not believe she would harm their children.

¶67. Mark explained that on the day the EMTs came to their house, *see supra* ¶44, he did not want to tell them that Oates was a threat to herself or others because he did not feel that way. Mark knew Oates was sick and needed help. As a result, he tried to tell the EMTs about Oates's belief that she was the Virgin Mary or Marie Laveau. The EMTs responded, however, that they could not help. Mark testified that Oates regularly talked about Marie Laveau but that he had never before heard of her. Mark explained that Oates was interested in Marie Laveau's life as a prominent black woman in a white-controlled New Orleans.

¶68. Mark testified that the day before Oates drove to Mississippi, she told him that she wanted to take the kids hiking. Mark stated that this was normal and that he thought nothing of Oates's plan. Oates woke up early the next morning. As she was leaving, Oates said, "I'm going to Mississippi." Mark testified that at the time, he thought Oates meant that she would go to Mississippi alone after the hike. After several hours passed and the snow started

23

falling, however, Mark began to wonder where Oates and the children were. Mark tried calling and texting Oates, but she did not respond. After a while, Oates finally answered one of his phone calls. Mark asked what was going on and if she was okay, and Oates told him that she and the children were driving to Mississippi.

¶69. Mark explained that he had not realized Oates was taking the children with her, and he asked where they were. By that time, Oates had reached Kentucky. Mark asked Oates to call him once she arrived wherever she and the children would stay. After the phone call, Oates and Mark texted back and forth. Oates told Mark that she had arrived safely and that she needed to "get away." Mark had never been to Mississippi, and he did not think Oates had either. Although Mark knew that Oates's maternal side of the family was from Mississippi, he thought there may have been only one cousin still living there.

¶70. A few days later, Mark noticed a police car parked near the house for "quite some time." Eventually, an officer came to the door and told Mark that he was conducting a welfare check on Oates because her family had reported their concerns after being unable to reach her. The officer asked about the children and asked for photos of them. Mark testified that he was more relieved than concerned because he thought the officer's visit meant that the officer would be able to check on his family in Mississippi. Mark testified that he had not spoken to Oates very much since the first day of her trip to Mississippi and that it was unusual for Oates not to answer his texts and phone calls.

¶71. After the officer left, Mark went about his day. He later woke up to a pounding at the door and saw police lights. Mark testified that he let the officers inside, and they gave him

"the horrible news" about Joshua's murder.

### G. The State's Rebuttal Witnesses

¶72. Mark's mother, Debrina Oates, testified that she had known Oates even longer than Mark because Oates had been her neighbor prior to dating Mark. Debrina testified that Oates was very intelligent and had taken college courses in psychology and business management. Debrina stated that she overheard a fight between Oates and Mark in which Oates threatened to take Joshua away from him. Debrina testified that she was shocked when she heard Oates had killed Joshua and that she never would have "guessed it in a million years that would ever happen." Debrina stated that she had never heard Oates talk about her ancestors or voodoo. Debrina also stated that she had possessed no knowledge of Oates's mental health issues. On cross-examination, Debrina admitted that she had not "had personal interaction" with Oates since at least 2018 and had not even known Oates's address at the time of Joshua's death.

¶73. Carol Johnston, who worked as a licensed practical nurse, testified that she helped treat Oates while Oates was incarcerated at the Jones County jail. Johnston stated that she never observed Oates have an outburst, cry, convulse, vomit, or hear voices. Although Oates's mother had been the one to request that Pinebelt Mental Health Services evaluate Oates, Johnston testified that she had never seen a need for Oates to undergo a mental evaluation. As a result, Johnston had never scheduled one. On cross-examination, Johnston explained that she saw Oates for a maximum of thirty minutes, twice a day, when she provided medications to Oates and the other women who shared the same cell.

¶74. Shannon Teel, who worked at the Hampton Inn when Oates checked into the hotel in the middle of the night on March 14, 2020, also testified on rebuttal. Teel stated that she did not recall anything about Oates that "stood out" on that occasion. Teel also stated that she did not see the children at any point.

¶75. After considering the parties' evidence, the jury found that Oates was legally sane at the time she murdered Joshua. The jury convicted Oates of capital murder, and the circuit court sentenced her to life imprisonment in MDOC's custody without eligibility for parole. Oates unsuccessfully moved for judgment notwithstanding the verdict (JNOV) or, alternatively, a new trial. Aggrieved, Oates appeals.

## ANALYSIS

### I. Sufficiency of the Evidence Regarding Oates's Sanity

¶76. Oates argues that the circuit court should have granted her motions for a directed verdict and later a JNOV. According to Oates, the State failed to present sufficient evidence to prove beyond a reasonable doubt that she was sane when she murdered Joshua. In reviewing the circuit court's denial of Oates's JNOV motion,

> [t]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. We accept as true all evidence consistent with the defendant's guilt together with all favorable inferences that may be reasonably drawn from the evidence.

*Rodriguez v. State*, 413 So. 3d 646, 654 (¶20) (Miss. Ct. App. 2025) (citations and internal quotation marks omitted). "We are not required to decide—*and in fact we must refrain from deciding*—whether *we think* the State proved the elements. Rather, we must decide whether

26

a reasonable juror could rationally say that the State did." *Haynes v. State*, 412 So. 3d 1170, 1184 (¶46) (Miss. Ct. App. 2025) (quoting *Lenoir v. State*, 222 So. 3d 273, 279 (¶25) (Miss. 2017)).

¶77.   Relevant to Oates's argument on appeal,

> Mississippi follows the *M'Naghten* test for determining sanity at the time of the offense. The *M'Naghten* test for determining insanity is whether the accused knew right from wrong at the time the act was committed. To prove insanity under *M'Naghten*, it must be proven that, at the time of the act, the accused was laboring under such defect of reason from disease of the mind as (1) not to know the nature and quality of the act he was doing or (2) if he did know it, that he did not know that what he was doing was wrong.

*Mount v. State*, 412 So. 3d 538, 553 (¶47) (Miss. Ct. App. 2025) (citations and internal quotation marks omitted); *see M'Naghten's Case*, 8 Eng. Rep. 718 (1843).

¶78.   A defendant is presumed sane until she raises a reasonable doubt as to her sanity. *Jackson v. State*, 394 So. 3d 420, 434 (¶55) (Miss. Ct. App. 2024). Once a reasonable doubt has been raised, "the State bears the burden to prove the defendant's sanity beyond a reasonable doubt." *Id.* (quoting *Hearn v. State*, 3 So. 3d 722, 738 (¶47) (Miss. 2008)). "The determination of a defendant's sanity under the *M'Naghten* Rule is within the province of the jury, and the jury has discretion to accept or reject expert and lay testimony on the subject." *Mount*, 412 So. 3d at 553 (¶46) (quoting *Ealey v. State*, 158 So. 3d 283, 294 (¶33) (Miss. 2015)). Here, there was no question that Oates murdered Joshua. The only question for the jury to determine was whether Oates knew "the nature and quality" of her act and whether she knew that the act was wrong. *Id.* at (¶47).

¶79.   Oates argues that she created reasonable doubt about her sanity through the

testimonies of Dr. Lott, Dr. Storer, and her husband, Mark. Oates argues that after these witnesses, the State failed to prove beyond a reasonable doubt that she was sane at the time of Joshua's murder. Oates focuses on the State's rebuttal witnesses, all of whom were lay witnesses rather than experts. She contends that none of these witnesses "were able to give evidence that [she] knew the nature and quality of her acts or that what she was doing was wrong." Moreover, Oates argues that none of these witnesses "contradicted" the expert testimony presented.

¶80. Despite Oates's assertions, nothing requires the State to provide proof of sanity in rebuttal to the defense's case. Nor is the State required to present expert testimony of sanity to meet its burden of proving sanity beyond a reasonable doubt. As discussed, the jury is free to accept or reject any lay or expert testimony, even in an insanity case. *Mount*, 412 So. 3d at 553 (¶46); *see also Blackwell v. State*, 257 So. 2d 855, 867 (Miss. 1972) (holding that "the issue of insanity was for the jury" even where "the defendant offered testimony of a psychiatrist and the [S]tate did not introduce expert evidence on rebuttal").

¶81. During Oates's trial, the jury heard evidence from which it could reasonably conclude beyond a reasonable doubt that Oates was sane when she killed Joshua. For instance, Oates admitted during her interviews that she brought the metal stake she used to kill Joshua from Ohio to Mississippi. Oates also admitted to Investigator Howell that she bought NyQuil two days before Joshua's murder and intended to give the NyQuil to her children on the night of the murder. Oates also left the crime scene after killing Joshua and drove across state lines to Louisiana. When she was arrested in New Orleans, Oates told the officers that she knew

28

why they were there to apprehend her. Finally, the jury heard Oates's own admission that she knew it was wrong to kill anyone, especially a child.

¶82. Viewing the evidence in the light most favorable to the State, the jury could infer that Oates killed Joshua with deliberate design and malice aforethought because she (1) brought the murder weapon with her from Ohio; (2) drugged Joshua to make him easier to kill; (3) drugged her other children to prevent them from interfering; (4) fled to New Orleans to avoid being arrested; and (5) knew that officers were arresting her because murdering Joshua was wrong. Because evidence existed from which the jury could conclude that the State proved Oates's sanity beyond a reasonable doubt, we find the circuit court did not err by denying Oates's JNOV motion. *See Rodriguez*, 413 So. 3d at 654 (¶20).

## II. Weight of the Evidence

¶83. Oates also argues that her conviction was against the overwhelming weight of the evidence presented at trial. When reviewing the denial of a new trial based on a challenge to the weight of the evidence, we view "the evidence in the light most favorable to the verdict and . . . will disturb a jury verdict only when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice." *Rodriguez*, 413 So. 3d at 654-55 (¶25) (quoting *Pace v. State*, 369 So. 3d 588, 597 (¶33) (Miss. Ct. App. 2023)). "We do not reweigh evidence. We do not assess the witnesses' credibility. And we do not resolve conflicts between evidence. Those decisions belong solely to the jury." *Mount*, 412 So. 3d at 553 (¶45) (quoting *Little v. State*, 233 So. 3d 288, 289 (¶1) (Miss. 2017)). In a case involving an insanity defense, the "jury's finding on a

29

defendant's sanity will not be reversed if it is supported by substantial evidence." *Id.* (quoting *Ealey*, 158 So. 3d at 294 (¶33)). As previously noted, the jury is free to accept or reject any expert or lay testimony. *Id.*

¶84. Although Dr. Lott and Dr. Storer both testified that they believed to a reasonable degree of medical certainty that Oates was insane at the time she killed Joshua, the jury did not have to accept their conclusions. As the jury also heard Dr. Storer testify during his cross-examination, psychology is an imprecise science, and there is room for experienced psychologists to disagree on whether someone knew the nature and quality of his or her actions. About one year passed before Dr. Lott interviewed Oates about Joshua's murder, and about three years elapsed before Dr. Storer interviewed her. Despite this passage of time, neither expert reviewed any greater amount of evidence relevant to determining Oates's legal sanity than what was presented to the jury at trial. In fact, Dr. Lott even admitted that he never reviewed the forensic interviews of the only other two eyewitnesses (Jack and Matt) present during the events leading to and following Joshua's murder. By contrast, in assessing the evidence for and against Oates at trial, the jury considered not only all the witness testimony but also reviewed each of Oates's interviews with law enforcement and the psychologists, her phone calls with Mark, and the forensic interviews of both Jack and Matt.

¶85. In reviewing all the available evidence and reaching an ultimate determination, the jury was also free to not accept as credible Mark's and Oates's claims that Oates began to hear voices and experience religious delusions a few months before she murdered Joshua. The jury may have found such statements unconvincing due to Mark's repeated failure to

seek psychiatric or medical help for Oates when such opportunities arose. The jury further may have found that Oates's statements lacked credibility based on medical documentation casting doubt on when she first began hearing voices. By contrast, the jury was free to accept as credible and rely on the testimony of multiple law enforcement officers, all of whom testified that they never saw Oates act irrationally, speak to the voices she claimed to hear, or appear distressed by her mental illness.

¶86. The jury also could have found that Oates's own statements and actions provided compelling evidence that she not only planned to kill Joshua but that she also understood the consequences of her actions. Oates failed to clearly communicate her travel plans with Mark prior to taking the children to Mississippi. When Mark attempted to contact her, Oates initially failed to answer his phone calls and text messages. By the time Oates finally answered Mark, she had already reached Kentucky with the children.

¶87. In addition, Oates brought the metal stake (the murder weapon) with her from Ohio. Moreover, two days before killing Joshua, Oates purchased NyQuil, which she used to help her younger children sleep during Joshua's murder. And after killing Joshua, Oates not only covered his head with a scarf-like fabric, but she also refused to let her younger sons enter the bathroom. Oates then left the hotel and drove across state lines to New Orleans with her two younger sons.

¶88. Oates claimed that the spirits and voices she experienced were a spiritual thing and that "only God above" could make her kill her own child. Despite these assertions, Oates admitted that she did not tell her mother about the spirits because she knew her mother would

31

say Oates was having a schizophrenic episode. Oates also admitted that she knew killing a child was wrong, but she claimed to believe she was killing a demon rather than Joshua. Upon being arrested, though, Oates told the officers that she "knew why [law enforcement was] there, and she didn't mean to do it." Almost three years later, Oates changed her story yet again and told Dr. Storer that she actually had been surprised by her arrest because she had not believed at that time that she had done anything wrong.

¶89. The jury reviewed Oates's initial interviews with law enforcement immediately following Joshua's murder and her subsequent statements to Dr. Lott and Dr. Storer one to three years after committing the murder. The jury was free to evaluate the inconsistencies in Oates's accounts of the events leading up to Joshua's murder and conclude that these inconsistencies occurred because Oates was lying about her actions and her mental health. We owe deference to the jury's verdict "concerning one of the most difficult questions of fact—legal sanity—with which a jury may be presented." *Sanders v. State*, 63 So. 3d 497, 506 (¶29) (Miss. 2011). The jury was best situated to weigh the competing evidence presented at trial, assess the witnesses' credibility, and resolve any conflicts in the evidence. *See Mount*, 412 So. 3d at 553 (¶45). And as discussed, in reaching its verdict, the jury reviewed as much, if not more, evidence regarding Oates's legal sanity during the trial than either expert admitted to using in forming his opinion. Thus, viewing the evidence in the light most favorable to the jury's verdict, we do not find that allowing Oates's conviction to stand results in an unconscionable injustice. *See Rodriguez*, 413 So. 3d at 654-55 (¶25). Rather, the record reflects substantial evidence from which the jury could determine that the

32

State proved Oates's sanity beyond a reasonable doubt. We therefore conclude that the jury's verdict was not against the overwhelming weight of the evidence presented at trial.

### III. Admission of the Autopsy Photograph

¶90. Oates argues that the circuit court abused its discretion by allowing the State to admit into evidence a photograph from Joshua's autopsy. The photograph at issue showed the side of Joshua's head as well as the metal rod still protruding from his skull. Oates objected to the photograph's admission at trial and asserted that the photograph lacked any probative value and served no purpose other than to inflame the jury. Oates asserts these same arguments on appeal.

¶91. We review the circuit court's admission of photographs for an abuse of discretion. *Sims v. State*, 347 So. 3d 222, 230 (¶32) (Miss. Ct. App. 2022). We will not disturb the admission of evidence unless the record shows a clear abuse of judicial discretion. *Id.* Mississippi Rule of Evidence 403 allows a trial court to exclude relevant evidence when "its probative value is substantially outweighed by a danger of . . . unfair prejudice . . . or needlessly presenting cumulative evidence." MRE 403. "Even if [a] photograph is gruesome, grisly, unpleasant, or even inflammatory, it still may be admitted so long as it has probative value and its introduction serves a meaningful evidentiary purpose." *Sims*, 347 So. 3d at 230 (¶33) (quoting *Morrison* v. State, 332 So. 3d 396, 402 (¶27) (Miss. Ct. App. 2022)). "[A] meaningful evidentiary purpose [is] one that describes the circumstances of the killing, its location, or the cause of death or supplements a witness's testimony." *Id.* (internal quotation marks omitted). Our caselaw holds that only "some probative value" is needed to

admit the photograph. *Id.*

¶92. At trial, Oates argued that the subject photograph's only purpose was to inflame the jury because Dr. LeVaughn had already described Joshua's injuries. The State responded that the photograph showed the nature and extent of Joshua's injuries. The State also argued that the photograph was the least inflammatory picture available that showed the injuries to Joshua's skull. After finding that the photograph "verif[ied] the horrific nature of these wounds" and aided the jury in determining whether Oates was able to distinguish right from wrong, the circuit court admitted the photograph.

¶93. The record reflects that the circuit court heard the parties' arguments, considered the photograph in question, and analyzed whether the photograph held some probative value for the jury. Although unpleasant, the photograph did not rise to the level of gruesomeness that the supreme court has previously deemed unfairly prejudicial. *See McNeal v. State*, 551 So. 2d 151, 159 (Miss. 1989) (finding that the subject photographs depicting a "decomposed, maggot-infested skull" were "gruesome and lack[ed] any evidentiary purpose"). And despite Oates's assertions to the contrary, the photograph possessed probative value. The photograph depicted the number of injuries inflicted upon Joshua before the final blow and conveyed the brutal nature of his death. The jury was entitled to weigh the manner of Joshua's death in determining if Oates was sane when she killed him. We therefore find no abuse of discretion in the circuit court's decision to admit the photograph.

## CONCLUSION

¶94. Finding no reversible error, we affirm Oates's conviction and sentence for capital

murder.

¶95.   **AFFIRMED.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., LAWRENCE AND EMFINGER, JJ., CONCUR. LASSITTER ST. PÉ, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION, JOINED BY WESTBROOKS AND McCARTY, JJ.; McDONALD, J., JOINS IN PART. WESTBROOKS AND McDONALD, JJ., DISSENT WITHOUT SEPARATE WRITTEN OPINION.**

**LASSITTER ST. PÉ, J., CONCURRING IN PART AND DISSENTING IN PART:**

¶96.   I agree that the State presented sufficient evidence of Oates's sanity and concur in the majority's holding on that point, as well as the holding that the trial court did not abuse its discretion by admitting the autopsy photos. However, I cannot agree that the jury's verdict finding Oates sane at the time she killed Joshua is supported by the weight of the evidence, and I respectfully dissent to that part of the majority opinion.

¶97.   When reviewing a challenge to the weight of the evidence, we must "view the evidence in the light most favorable to the verdict and disturb the verdict only when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice." *Little v. State*, 233 So. 3d 288, 290 (¶1) (Miss. 2017). We cannot reweigh evidence, assess witness credibility, or resolve conflicts in the evidence. *Id.* In a case involving an insanity defense, the "jury's finding on a defendant's sanity will not be reversed if it is supported by substantial evidence." *Ealey v. State*, 158 So. 3d 283, 294 (¶33) (Miss. 2015) (quotation mark omitted). The jury is free to accept or reject any expert or lay testimony. *Id.*

35

¶98. While keeping in mind *Little*'s admonition that this Court is not the thirteenth juror and cannot weigh evidence or assess credibility, I must conclude that the verdict finding Oates sane at the time she killed Joshua is against the overwhelming weight of the evidence. Though the standard of review favors the State and the evidence that supports the jury's verdict, the State still must show beyond a reasonable doubt that Oates was sane. *See Hawthorne v. State*, 883 So. 2d 86, 90 (¶13) (Miss. 2004). To do so, the State must have produced "*substantial evidence* regarding the defendant's sanity." *Id.* (emphasis added).

¶99. In *Hawthorne*, David Hawthorne believed that God wanted him to drive a truck from Tupelo to Virginia to deliver a cross and cure his wife's cancer, and while doing so, he ran a red light and struck a car driven by a man who died as a result of the collision. *Id.* at 88 (¶4). At Hawthorne's trial, evidence showed that he had begun experiencing religious delusions and hearing voices in the weeks before the wreck. *Id.* at (¶3). Evidence also showed that law enforcement officers noted "erratic" behavior immediately after the collision and later transferred Hawthorne to a hospital for psychiatric treatment. *Id.* at (¶5). "Numerous mental health professionals" testified at trial that Hawthorne was insane under *M'Naghten* at the time of the wreck. *Id.* at (¶6). Hawthorne was found guilty, and this Court reversed and rendered after finding that the State failed to produce sufficient evidence to support the conviction. *Id.* at 88-89 (¶¶6-7); *Hawthorne v. State*, 881 So. 2d 234, 238-39 (¶13) (Miss. Ct. App. 2003).

¶100. However, the Supreme Court reversed this Court and instead remanded for a new trial, finding that although the State produced sufficient evidence of sanity, Hawthorne's

conviction was against the weight of the evidence. *Hawthorne*, 883 So. 2d at 90 (¶13). The Supreme Court concluded that "the evidence adduced by the State to prove sanity [was] weak," noting that the State had to "produce substantial evidence regarding the defendant's sanity." *Id.* The Supreme Court held that the record "lacks substantial credible evidence suggesting that at the time in question, Hawthorne was sane in the *M'Naghten* sense." *Id.*

¶101. The State attempts to distinguish Oates's case from *Hawthorne* by pointing out that in that case, the crime was manslaughter and not intentional murder. But I see no legal distinction in the culpability of these acts insofar as sanity goes. The State also notes that in *Hawthorne*, there was evidence that the defendant's behavior was erratic and that he appeared to be on drugs, while in Oates's case, no law enforcement officer testified that Oates's behavior was cause for concern. But the fact that Oates remained calm and did not pose a threat to law enforcement days after the murder does not speak to the ultimate question presented to the jury: did Oates know right from wrong *when she killed her son*?

¶102. The most relevant distinction between *Hawthorne* and the present case is the admission by the State in *Hawthorne* that the State's case was weak. *Id.* at 90 (¶13) ("At the end of the trial during Hawthorne's motion for directed verdict, the State acknowledged that there was little evidence in the record to show that Hawthorne knew the difference between right and wrong."). There is no such admission here. Even so, much of the evidence the State points to as "substantial" proof of Oates's sanity is substantial proof that Oates killed Joshua with deliberate design, a point no one contests. However, it does not speak to Oates's ability to distinguish right from wrong. This leaves the jury with only the testimony of the

psychologists and law enforcement about their observations of Oates and the jury's own interpretation of Oates's credibility during her interviews.

¶103. The majority focuses primarily on the jury's role in determining witness credibility, noting that the jury did not have to accept Dr. Lott's or Dr. Storer's testimony that Oates was not sane, Oates's claims that she had been experiencing delusions for months before the murder, or Mark's testimony supporting Oates's version of events. While this is true, looking only at the jury's role in evaluating credibility and inconsistencies in the evidence ignores what the Supreme Court has said about the *State's* role in insanity cases—that the State *must* present evidence to prove sanity beyond a reasonable doubt by producing substantial evidence of sanity. *See Hawthorne*, 883 So. 2d at 90 (¶13) ("Even though sanity is for the jury to determine, the State must produce substantial evidence regarding the defendant's sanity."). While I acknowledge and agree that the role of the jury is to weigh witness credibility and resolve conflicts in the evidence, I cannot disregard the State's obligation to produce substantial evidence of sanity.

¶104. Setting aside the jury's role in determining credibility and resolving conflicts in the evidence, the State's evidence of sanity is weak: officers who did not think Oates was acting oddly and did not see her talking to herself, a nurse who saw Oates as she handed out medication to several women in Oates's jail cell, and Oates's mother-in-law, who had not seen Oates since 2018.

¶105. If we allow the jury's verdict to stand in an insanity case no matter how weak the State's case, we are essentially acknowledging that there is *no* circumstance in which a jury's

verdict could be overturned based on the weight of the evidence. That was the argument the State made in *Hawthorne*—that the State does not "have to produce any evidence of the defendant's sanity because it was for the jury to determine"—and the Supreme Court rejected it. *Id.*

¶106. Allowing the jury's verdict to stand in this case results in an unconscionable injustice. The State did not produce substantial evidence to prove beyond a reasonable doubt that Oates was sane. We owe deference to the jury's verdict "concerning one of the most difficult questions of fact—legal sanity." *Sanders v. State*, 63 So. 3d 497, 506 (¶29) (Miss. 2011). But we do not owe blind obedience to the verdict, especially when it is not supported by substantial evidence establishing beyond a reasonable doubt that the defendant knew right from wrong. Oates presents us with such a case. Her conviction should be reversed, and she should be granted a new trial.

**WESTBROOKS AND McCARTY, JJ., JOIN THIS OPINION. McDONALD, J., JOINS THIS OPINION IN PART.**